WAL–MART STORES, INC., Appellant,

v.

Wendy DAVIS, Appellee.

No. 03–96–00693–CV.

Court of Appeals of Texas,
Austin.

Sept. 24, 1998.

Rehearing Overruled Dec. 3, 1998.

J. Preston Wrotenbery, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, L.L.P., Houston, for Appellant.

Susan I. Goodman, Hilgers & Watkins, P.C., Austin, for Appellee.

Before CARROLL, C.J., and JONES and KIDD, JJ.

JONES, Justice.

Wendy Davis sued Wal–Mart Stores, Inc. ("Wal–Mart")[1] for sexual harassment, intentional infliction of emotional distress, negligent supervision and retention, assault, and invasion of privacy. The jury answered affirmatively on the sexual harassment, assault, and invasion of privacy issues, awarding damages both on the tort claims and on the sexual harassment claim. After making findings on issues reserved by agreement for the court, and after post-trial motions, the trial court rendered final judgment, finding that Davis was entitled to only one recovery for her injuries and awarding her $196,850 in actual damages, $32,215 as equitable back pay, and $56,165 as equitable front pay; the court also awarded Davis $427,000 in attorney's fees.

Wal–Mart brings eleven points of error attacking the judgment. Wal–Mart challenges the sufficiency of the evidence to support Davis's sexual harassment claim, tort claims, and the damage award for medical expenses and mental anguish. Wal–Mart also contends that Davis is not entitled to recover "front pay" or attorney's fees. Finally, Wal–Mart challenges the imposition of sanctions for discovery abuse. We will affirm the trial court's judgment.

## BACKGROUND

Davis began her employment with the Wal–Mart store in Marble Falls, Texas in 1986. Tom Patterson, the store manager, hired her. After four months as a sales clerk in sporting goods, Davis was promoted to department manager, still a classified hourly position. Davis requested and obtained transfers to other Wal–Mart stores, but eventually returned to Marble Falls.[2]

---

1. Davis also sued Thomas Patterson, the store manager. He filed bankruptcy, was severed from this litigation, and is not a party on appeal.

2. Davis transferred in 1988 and 1989 for personal reasons. She returned to Marble Falls in 1989 because of her two children's residential prefer-

Patterson began the complained-of course of conduct by acts such as commenting that Davis looked good in jeans, standing too close, rubbing her arms, and poking her ribs. Davis would try to wear slacks on days when she needed to climb a ladder to arrange merchandise displays. However, on days she was wearing a dress, Patterson would find reasons for Davis to climb a ladder and would tell her to climb higher so that he could have a better view. At a company event, Patterson remarked in the presence of Davis's husband, that he, Patterson, had wanted Davis to wear a short skirt and bend over so that Patterson would have something to look at.

Two incidents involved Patterson's "coaching" of Davis.[3] In the first, which occurred in July 1993, a customer complained that Davis had been following the customer and acting as if the customer were a shoplifter. Davis denied wrongdoing and began to cry.[4] As Davis described it, her chair was against the desk in Patterson's office. Patterson placed his chair in front of hers, putting his legs on either side of hers, pinning her knees between his. Patterson grabbed her by the upper part of her thighs and told her to stop crying. He would not let go of her legs; he told her not to be upset because he was not going to enter a written "coaching." Davis said Patterson held on for two or three minutes even after she told him to stop.

The second incident, which occurred in November 1993, involved a confrontation between Davis and a subordinate whom Davis overheard using profanity directed at her and belittling her to a customer. Davis and her husband were shopping at the time. The confrontation ended in a shouting match.

When they arrived home, Davis's husband called Wal–Mart's regional personnel manager to complain; she was not there, so he left a message.

The next day, Patterson called Davis in for a "coaching," during which Patterson told her he did not approve of her engaging in this confrontation and asked her to apologize to her subordinate. Davis refused and became upset. Patterson again grabbed her thighs and refused to let go. Tim Rutledge, the district loss-prevention supervisor, and Deidra Bryant, an assistant store manager, were also present. This incident with her subordinate ultimately resulted in a written "coaching" form being placed in Davis's file. Before this incident, she had received consistently high performance evaluations.

When Davis returned home, she found her husband talking on the telephone with Marie Hughes, Wal–Mart's regional personnel manager. After discussing the problem she had with the subordinate, Davis complained to Hughes about Patterson's conduct. Wal–Mart then began investigating the complaint. Patterson was transferred to San Antonio in December 1993. Additional facts will be detailed in discussing Wal–Mart's challenges to the sufficiency of the evidence.

*Governing Law*

■ The Texas Commission on Human Rights Act ("the Act") governs Davis's claim for sexual harassment. Tex. Labor Code Ann. § 21.051 (West 1996). The Act is intended to carry out the policies of Title VII of the Civil Rights Act of 1964. *Id.* § 21.001(1). Texas courts routinely rely for guidance on federal court decisions addressing Title VII. *Specialty Retailers, Inc. v.*

---

ences and her mother's availability to assist with childcare.

3. "Coaching for improvement" is Wal–Mart's process for dealing with employee performance problems. Its stated purpose is to notify the employee of a behavior and performance problem and give the employee an opportunity to correct that problem. It consists of several steps, beginning with verbal and written reminders and progressing to a day off with pay for an employee to decide whether he or she is willing to make necessary changes to continue the job, including developing a written plan of action. However, Wal–Mart's guidelines for use of differ-

ent coaching levels state that major infractions usually result in termination the first time they occur because of the nature of the infraction or the implications for the business. The examples of major infractions listed in the manual are theft, sexual harassment, and falsification of records.

4. At that time, Davis spent part of her time performing loss-prevention duties. There was apparently the possibility of creating a full-time loss-prevention position in the store, a position that Davis considered a promotion and wanted to obtain.

*DeMoranville,* 933 S.W.2d 490, 492 (Tex. 1996); *City of Austin v. Gifford,* 824 S.W.2d 735, 739 (Tex.App.—Austin 1992, no writ). Sexual harassment is a form of employment discrimination prohibited by Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Syndex Corp. v. Dean,* 820 S.W.2d 869, 871 (Tex.App.—Austin 1991, writ denied). In general, sexual harassment claims have been divided into two categories: (1) quid pro quo harassment, in which employment benefits are conditioned on sexual favors; and (2) harassment that creates a hostile or offensive work environment. *Syndex,* 820 S.W.2d at 871. Davis brought a hostile-environment claim.

In order to establish a claim against Wal–Mart, Davis had to show that she was a member of a protected group; that she was subjected to unwelcome sexual harassment; that the harassment complained of was based upon gender; that the harassment affected a term, condition, or privilege of her employment; and that Wal–Mart knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment.[5] *McMillon v. Texas Dep't. of Ins.,* 963 S.W.2d 935, 940 (Tex.App.—Austin 1998, no pet.); *Hirras v. National R.R. Passenger Corp.,* 95 F.3d 396, 399 (5th Cir.1996); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Davis's status as a member of a protected group is not disputed.

## PROMPT REMEDIAL ACTION

■ In its first and ninth points of error, Wal–Mart contends that, even if Davis established every other element of her cause, it took prompt remedial measures reasonably calculated to end the harassment; therefore, the evidence is legally and factually insufficient to support the sexual harassment claim.

■ We review a no-evidence point by considering only the evidence and inferences tending to support the jury's finding, disregarding all contrary evidence and inferences. *Continental Coffee Prod. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex. 1993). If the plaintiff presents only a scintilla of evidence on a required element of the cause of action, then the no-evidence point must be sustained. *See Continental Coffee,* 937 S.W.2d at 450.

■ We review a factual-sufficiency point by considering and weighing all the evidence; we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Texas L.Rev. 515 (1991).

Wal–Mart contends Patterson's transfer from the Marble Falls store and the policies and procedures it has in place to deal with sexual harassment conclusively negate Davis's claim. We disagree. For the reasons stated below, we believe a reasonable jury could have concluded that Wal–Mart's actions did not constitute effective remedial measures.

### Training in Handling Sexual Harassment Issues

Barbara Thomas served as the in-store personnel manager from May 1990 to May 1995. Although she agreed it was her responsibility to inform employees about Wal–Mart's policies and procedures, she admitted she did not know anything about Wal–Mart's sexual harassment policies and procedures. She had seen a poster hanging in the employee's lounge with some general information but knew nothing about sexual harassment issues until Patterson's 1993 transfer. From 1979 until the time of trial, she had no training in any policies and procedures for dealing with sexual harassment.

Richard Barbour, the district manager, did not know much about sexual harassment oth-

---

5. The impact of the Supreme Court decisions in *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* —— U.S.

——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), on the plaintiff's burden of proof will be discussed later in the opinion.

er than the material that was in the Wal–Mart policy manual. He remembered having "a class on it a couple of years ago" and discussing the subject at one corporate meeting. That was the extent of his training; he was unaware of any special training programs for dealing with sexual harassment issues.

To show it had procedures in place for employees to report sexual harassment, Wal–Mart introduced in evidence a poster concerning sexual harassment that Wal–Mart displayed in an employee lounge. Paula Strittmatter, who performs sexual harassment investigations for Travis County, testified that the poster was inadequate to notify employees of their rights.

Michael Cockrell, a regional vice president of Wal–Mart, and Marie Hughes, a regional personnel manager, both admitted that Patterson had violated Wal–Mart's sexual harassment policy by his actions toward Davis.

### Wal–Mart's Treatment of Patterson

Thomas Patterson testified that he had received only about "fifteen minutes" of training on Wal–Mart's policies and procedures for identifying and dealing with sexual harassment. Neither he nor anyone else at the store had any responsibility for training employees in sexual harassment policy.

Patterson's personnel file revealed a 1983 incident involving four female employees at a Wal–Mart store in Arkansas. Patterson described the incident as merely "flirtatious conduct"; it was not his understanding that he had ever engaged in sexual harassment. He admitted to additional incidents at the Marble Falls store such as sitting on female employees' laps, putting female employees across his knees to spank, and engaging in sexually oriented teasing. However, he did not consider any of his actions toward Davis to be harassment. It was not his understanding that he was transferred from Marble Falls to San Antonio because of his actions toward Davis. No one told him that he had violated Wal–Mart's sexual harassment policy. The reason for his transfer was described as "leadership inconsistencies."

Michael Earl Cockrell, Wal–Mart's regional vice-president, testified that Patterson violated Wal–Mart's sexual harassment policy with regard to Davis. He had not, however, questioned Patterson concerning Davis's specific allegations and did not know if anyone had tried to verify her claims. He had already decided to remove Patterson from the store even before Marie Hughes initiated her investigation. Cockrell was concerned that Patterson had been in one store too long; it was highly unusual for a store manager to remain in one store for eight to ten years. He was concerned that Patterson had become "too familiar" with the associates. No special training in sexual harassment policy was mandated or offered after the incident. Cockrell never followed up on any rumors that other workers at the store blamed Davis for Patterson's transfer and said she brought the harassment on herself. He took no special steps to monitor Patterson's performance in San Antonio. There was evidence that, after Patterson was transferred from San Antonio to Galveston and promoted to manager in that store, he again harassed female employees.

Marie Hughes testified that Cockrell never told her that Patterson was transferred to protect Davis; he thought it best for the store as a whole.

### Wal–Mart Failed to Follow Its Own Policies and Procedures

The record contains evidence that Wal–Mart did not follow its own policies and procedures in dealing with Patterson after Davis's complaint to Hughes. Wal–Mart's policy manual describes the levels of coaching for different offenses—sexual harassment is in a category that "usually" results in immediate termination. In Patterson's case, no coaching form was even placed in his file indicating that he had been disciplined for sexual harassment. Although a personnel action form indicated a demotion, the "remarks" section noted "leadership inconsistencies." Wal–Mart policy required the company to tell an offender exactly what conduct was inappropriate, yet Wal–Mart failed to give Patterson any specific examples of improper behavior. Patterson's supervisors appeared to go to great lengths to avoid even

using the term "sexual harassment." Cockrell said he transferred Patterson to San Antonio to work with two managers who had better "people skills."

Patterson's four-month transfer to an assistant manager's position in San Antonio did not result in financial loss to him. Although not eligible for a bonus while he was an assistant, his base salary actually increased. He also received a raise while in San Antonio as well as the payout for the bonus earned while he was still at Marble Falls. Within six months he was a manager in Galveston and again eligible for a bonus. This is inconsistent with Wal–Mart's formal coaching policy, which requires that employees under active coaching for improvement must demonstrate satisfactory performance during a twelve-month period before they can be transferred or promoted.

### Adequacy of the Remedial Measures

 Whether an employer's action in response to a sexual harassment claim is sufficient "will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989). Even if the employer takes some remedial steps, the employer will still be liable if its actions were not reasonably calculated to stop the harassment.[6] *Id.* The United States Supreme Court has identified a two-fold purpose behind Title VII's enactment: (1) eliminating employment discrimination, and (2) allowing the aggrieved party to be made whole for those injuries suffered on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *see also City of Austin v. Gifford*, 824 S.W.2d 735, 739 n. 2 (Tex.App.—Austin 1992, no writ). Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms. *Burlington Indus., Inc. v. Ellerth*, —— U.S. ——, ——, 118 S.Ct. 2257, 141 L.Ed.2d 633,

654 (1998). Logically, then, the efficacy of an employer's remedial measures should be evaluated in light of Title VII's purposes.

Wal–Mart relies on several cases, among them *Waymire v. Harris County*, 86 F.3d 424 (5th Cir.1996), as support for its position. *Waymire* involved two prison guards. A male guard circulated a sexually explicit drawing of a female guard. The supervisor verbally reprimanded the male guard and placed a formal letter of reprimand in the male guard's personnel file. *Id.* at 427. In holding that Harris County took prompt remedial measures, the court noted that the male guard was twenty-one and had been on the job for less than six months at the time of the incident; it was his first documented offense; he never harassed the victim again; and the record did not show he ever harassed *anyone else*. *Id.* at 429. In affirming the district court's grant of judgment as a matter of law[7] for Harris County, the court noted that such a motion is properly granted when the facts and the inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict. *Id.* at 428.

Wal–Mart also relies on *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396 (5th Cir.1996). In *Hirras*, an Amtrak[8] employee received obscene and threatening anonymous telephone calls at work and home, graffiti about her was painted on a wall, and a vulgar note was left on her windshield. Some of her co-workers received similar calls. *Id.* at 398. Amtrak supervisors began investigating and told her that if they found out that an Amtrak employee was responsible for the harassing actions, that employee would be fired. *Id.* at 399. Amtrak promptly painted over the graffiti. Although law enforcement attempted to trace the phone calls and match the typeface on the note, the person responsible was never identified. *Id.* The court, in upholding summary judgment for Amtrak, noted that whether an employer's response is

---

6. In *Waltman,* the supervisor told the offending employee to stop making certain comments, but did not reprimand that employee or make a note of the incident in the employee's file. The court held a fact issue existed as to whether the employer took prompt remedial action.

7. Fed.R.Civ.P. 50.

8. The National Railroad Passenger Corporation.

sufficient to defeat a claim depends on the facts of a particular case. *Id.* at 399–400. The court observed that Amtrak had launched a thorough investigation, even calling in law enforcement, but had never been able to identify the offender. Under these circumstances, the court said, "no reasonable juror could find that Amtrak failed to take prompt remedial action in response to Hirras's complaints." *Id.* at 400.

*Carmon v. Lubrizol Corp.,* 17 F.3d 791 (5th Cir.1994), involved a complaint for co-worker verbal harassment. Although the employer could substantiate nothing more than that both employees used foul language during a confrontation, the male employee nevertheless was reprimanded in writing and transferred to another shift. *Id.* at 793. The second allegation also involved a co-worker. An investigation by two supervisors was unable to substantiate sexual harassment, but did find some proof of inappropriate workplace behavior. The company distributed a memo warning against vulgar and abusive language, practical jokes, or horseplay. It also held meetings to discuss appropriate workplace behavior. *Id.* at 794. The district court found these were prompt remedial actions. The Fifth Circuit dismissed the appeal as frivolous because appellant wholly failed to address the ground on which the district court dismissed the cause. *Id.* at 794.

In *Nash v. Electrospace System, Inc.,* 9 F.3d 401 (5th Cir.1993), the Fifth Circuit affirmed a summary judgment for the employer; the employee had not responded to the employer's motion for summary judgment, so there was no controverting evidence adduced by the movant. *Id.* at 402. Nash was a secretary; the attorney who supervised her work did not have the power to hire or fire her, a fact of which she admitted being aware. *Id.* at 404. She also admitted that her job performance was sub-par and she had been criticized for it shortly before the complaint. *Id.* at 403. She complained that the attorney asked her unwelcome questions about her sex life; however, there were no allegations of any physical contact. When she complained, her supervisor was immediately interviewed and denied anything but consensual conversations. *Id.* The employer was not able to corroborate the allegations and no other women had experienced offensive behavior. *Id.* at 404. Nash was transferred to another division, where she admitted she liked her supervisor and received a raise. She admitted that the transfer was not an adverse employment decision. *Id.*

Wal–Mart's situation is clearly distinguishable from the cases it relies on to show that it took prompt remedial measures. In contrast to *Waymire,* Patterson was a store manager with the power to hire and fire Davis, had a documented history of a previous incident, did not have a written reprimand placed in his personnel record, and *offended again.* In contrast to *Nash,* some of Patterson's offensive conduct was also directed at other women. In contrast to *Lubrizol,* in which a disputed complaint of co-worker harassment resulted in memos and meetings concerning appropriate workplace behavior, Wal–Mart offered no remedial training either to Patterson or to other employees at the Marble Falls workplace. *Hirras* was a peculiar case in which the employer, even after calling in law enforcement, could not identify an offender to discipline.

Wal–Mart's actions also are in contrast with the employer's actions in a recent case in which this Court upheld a jury finding that an employer took prompt remedial measures. *See McMillon v. Texas Dep't of Ins.,* 963 S.W.2d 935, 940 (Tex.App.—Austin 1998, no writ). *McMillon* involved co-worker sexual harassment. The Department of Insurance put the alleged harasser on administrative leave while it investigated. After concluding that sexual harassment occurred, the Department placed the offender on a ninety-day probationary period, reduced his pay by $5000 a year, transferred him to a non-managerial position in another division, required him to attend sexual harassment awareness training, and required him to review the agency's policies regarding sexual harassment. *Id.*

We must consider all of the facts of the case. We do not regard Patterson's mere transfer to San Antonio as conclusively establishing that prompt remedial measures were taken, nor do we regard Wal–Mart's

subsequent transfer of Patterson to Galveston in violation of its own policies as conclusively negating that prompt remedial measures were taken. Nor do we say that an employer may never "kill two birds with one stone"; i.e., implement remedial measures that both serve Title VII's purposes and other corporate purposes. In this case, however, based on all of the facts, Wal–Mart's actions toward Patterson and Davis do not appear to have been designed to serve any significant Title VII purpose; certainly the converse is not established as a matter of law.

Davis presented evidence that Patterson was a profitable but not trouble-free manager. His temper was a consistent problem throughout his employment with Wal–Mart and had been noted in his evaluations. Performance reviews cautioned him about maximizing profit at the expense of other important objectives, for example, scrimping on expenditures needed to keep the store looking good. Associate evaluations of Patterson conducted in January 1993 consistently mentioned as problems Patterson's temper, intimidation of associates, and lack of support for Wal–Mart's "open door policy." Comments included that he supported male associates more than female, that an associate who used the open door policy would be dismissed, and that associates had been mistreated after they had come to him for help or comments.

It is difficult to see how a remedial measure designed to end workplace discrimination can include the elaborate lengths to which Wal–Mart went to avoid even using the phrase "sexual harassment" with respect to Patterson. Wal–Mart's failure to enter a written reprimand in Patterson's file and its violation of its own coaching and promotion policies suggests that Patterson's transfer to San Antonio was not a disciplinary measure at all, no matter which box was checked on his personnel form. Further, there was evidence that no special training was mandated or even offered for those remaining at the store in how to deal with sexual harassment.

Davis testified that she suffered retaliatory treatment from her co-workers; she testified they said "that they shouldn't talk to me because I would file charges on them." Davis also said her co-workers implied that she had caused the problem or "asked for it." Francis Baxter, an assistant store manager, testified that the rumor was that Patterson's transfer was "Wendy's fault." Steven Bartlett, a Wal–Mart employee, testified that most people at the store thought Davis's charges were false. Dr. Keene, Davis's expert psychologist, noted in his report on Davis's condition that Patterson frequently visited the Marble Falls store even after his transfer; such visits continued to distress Davis, although she had no confrontations with him. When Davis requested time off to recover, the new manager told her that "whatever" had happened, Davis needed to "get past it," denied Davis's request for days off, and threatened to fire her if she used sick leave without a doctor's note. This attitude suggests a lack of belief either that Patterson had harassed Davis or that his actions toward her and other female employees were improper at all. Such actions send a message that there are negative consequences of complaining, thereby defeating the goal of creating effective grievance mechanisms.

We hold that there was legally and factually sufficient evidence to support the jury's finding that Wal–Mart failed to take prompt remedial measures reasonably calculated to end the harassment.

## WAL–MART'S KNOWLEDGE OF THE HARASSMENT

Davis also had to establish that Wal–Mart "knew or should have known" about the harassment in order to hold Wal–Mart liable for Patterson's actions. As part of points of error one and nine, Wal–Mart contends there is legally or factually insufficient evidence to support the "know or should have known" aspect of Davis's claim. *See Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Soto v. El Paso Natural Gas Co.,* 942 S.W.2d 671, 678 (Tex.App.—El Paso 1997, writ denied). Knowledge can be established by a specific complaint to higher management or by showing that the pervasiveness of the

harassment was such as to give rise to an inference of knowledge or constructive knowledge by the employer.

As evidence that it could not and should not have known about Patterson's conduct before Davis's complaint to Marie Hughes, Wal–Mart relies on its "open door" policy, the regular presence of higher level management in the store, and Davis's failure to alert any of these people. As set out above, however, the very people that Wal–Mart says were regularly in this store and would have been available to Davis to talk to are the same people who testified that they had little, if any, training in dealing with sexual harassment. Davis also testified that she had told Patterson to stop the offending actions; not only did it do no good, the harassment actually escalated thereafter. There was also evidence that Patterson was known to have a volatile temper and that the "open door" policy did not work at the Marble Falls store.

Patterson's inappropriate conduct was not limited to Davis. For example, at a department manager meeting, Patterson sat on the lap of a female department manager and "wiggled." That employee reported that this behavior did not bother her since it was common at the store. Patterson put the female personnel manager of the store across his knee and "spanked" her (this is the person who was supposed to train others in policies and procedures concerning sexual harassment); he also attempted to do so with another female associate. The members of higher level management who were in the store regularly apparently either ignored this conduct or did not understand its implications. Wal–Mart cannot escape responsibility for its store managers' actions by refusing to train them and their supervisors in the fundamentals of how to deal properly with sexual harassment.

Patterson had also been involved in an incident involving harassment at a Wal–Mart store in 1983. Wal–Mart asserts that the trial court abused its discretion in admitting this evidence. However, Wal–Mart failed to object to the admission of this evidence other than through various motions in limine and pre-trial motions to exclude. It made no trial objections, thereby waiving any complaint. *See Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (1963). This evidence, along with evidence about other events in the store, tends to show an ongoing pattern of harassing behavior on Patterson's part.

We hold that Davis produced legally and factually sufficient evidence to establish the necessary element that Wal–Mart knew or should have known of Patterson's conduct.

### Impact of June 26, 1998 Supreme Court Decisions

In two opinions delivered June 26, 1998, the United States Supreme Court waded into the murky waters of employer liability for a supervisor's harassment and significantly lessened the employee's burden. *See Burlington Indus., Inc. v. Ellerth*, —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In *Ellerth*, the Court analyzed the history of vicarious liability in such actions and the variety of ways in which courts have applied agency principles in deciding whether an employer was liable for a supervisor's actions. —— U.S. at ——–——, 118 S.Ct. at 2267–71, 141 L.Ed.2d at 651–55. The Court concluded:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at ——, 118 S.Ct. at 2270–71, 141 L.Ed.2d at 655.

Once having established an actionable hostile environment, Davis would not, under the

*Ellerth* analysis, have the burden of showing that Wal–Mart knew or should have known of the harassment and that Wal–Mart failed to take prompt remedial measures. Patterson was the store manager and had the authority to take adverse employment actions against Davis, including firing her. The Supreme Court's opinion in *Ellerth* would seem to establish Wal–Mart's liability for Patterson's actions, subject to an affirmative defense from Wal–Mart. Given our holding that Davis met her burden of proof by raising a fact issue that Wal–Mart failed to take prompt remedial measures, Wal–Mart by definition could not meet its burden to show that it conclusively proved an affirmative defense of prompt remedial measures. Given the evidence concerning Wal–Mart's failure to follow its stated policies or educate its managers in these policies, we do not think Wal–Mart could establish that Davis unreasonably failed to take advantage of its policies or otherwise failed to minimize her harm. Accordingly, we see no reason for a remand in light of these decisions.[9]

We hold that legally and factually sufficient evidence supports the jury finding that Wal–Mart knew or should have known of Patterson's harassment and failed to take prompt remedial action. We overrule points of error one and eight.

### AFFECTING A "TERM, CONDITION, OR PRIVILEGE" OF EMPLOYMENT

■ In its second point of error, Wal–Mart contends there was no evidence[10] to support the jury's finding of sexual harassment because Patterson's conduct did not rise to the level necessary to invoke protection under the Act. Wal–Mart contends that Davis was not subjected to unwelcome sexual harassment and that the harassment, if any, did not rise to the necessary level that affected a term, condition, or privilege of employment. Wal–Mart first argues that not enough objectionable events occurred within the relevant period to create an actionable hostile environment claim. We disagree.

### Continuing Violation

The Act requires a complaint to be filed with the federal Equal Employment Opportunity Commission or the Texas Commission on Human Rights within 180 days after the alleged unlawful employment practice occurred. *Specialty Retailers, Inc. v. DeMoranville,* 933 S.W.2d 490, 492 (Tex.1996). Wal–Mart argues that Davis identified November 1, 1993 as the date of the earliest unlawful employment practice in her complaint to the agency. However, Davis's complaint also contained allegations that she had been subjected to continuous sexual harassment since 1991, giving as examples Patterson's remarks asking her to stand on a ladder so he could look up her skirt and asking her to bend over and touch her toes, as well as identifying the "coaching" encounters.

■ When a charge is timely filed as to one act of discrimination, the doctrine of continuing violation expands the scope of those discriminatory events that are actionable, as long as one of the events occurs within the 180–day period. *Glass v. Petro–Tex Chemical Corp.,* 757 F.2d 1554, 1560–61 (5th Cir.1985). This doctrine applies when an unlawful employment practice manifests itself over time, rather than as a series of

---

9. In *Ellerth,* the Court remanded both for Ellerth to show a hostile environment claim, rather than a quid pro quo claim, and for Burlington to have the opportunity to raise the affirmative defense. —— U.S. at ——–——, 118 S.Ct. at 2270–71, 141 L.Ed.2d at 655–56. In *Faragher,* which involved a hostile environment claim against a supervisor, the Court reviewed the evidence presented and concluded that the employer would not be able to sustain an affirmative defense, and so rendered judgment on the trial court verdict. —— U.S. at ——–——, 118 S.Ct. at 2292–94, 141 L.Ed.2d at 689–91. Because we have already held that Davis presented sufficient evidence to establish that Wal–Mart knew or should

have known of Patterson's harassment and failed to take prompt remedial action under the pre-*Ellerth* analysis, the *Ellerth* and *Faragher* decisions do not change the outcome. Accordingly, we need not consider any issues concerning prospective application. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 503 (Tex.1997).

10. Wal–Mart did not bring an insufficient evidence point or argue factual insufficiency under point two.

discrete acts. *Webb v. Cardiothoracic Surgery Assocs. of North Texas, P. A.*, 139 F.3d 532, 537 (5th Cir.1998). This relieves a Title VII plaintiff of having to prove that the entire violation occurred within the actionable period, provided that the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Id.* The core idea of the continuing-violation doctrine is that equitable considerations may require that the filing period not begin until acts supportive of a civil rights action are, or should be, apparent to a reasonably prudent person in the same or a similar position. *Id.; Glass,* 757 F.2d at 1560–61. The focus is on what event should, in fairness and logic, have alerted the average layperson to act to protect his or her rights. *Webb,* 139 F.3d at 537; *Glass,* 757 F.2d at 1561. In *Webb,* the plaintiff filed a complaint in September 1994, referring back in part to conduct occurring in January and February 1993. Webb stated that she knew the conduct in January 1993 and February 1993 was sexual, and she had been offended. The court held she was on notice at that point that she was being harassed and that the offensive actions would have supported a claim at that time. It declined to apply the continuing-violation doctrine and limited her case to actions occurring within 180 days of filing the complaint. *Id.* at 538.

In the present case, Davis did not have a discrete incident upon which she could have filed a complaint. It is doubtful that one or two remarks concerning climbing ladders or wearing short skirts would have given rise to an actionable complaint. Further, Davis testified that the conduct escalated and intensified after she began dating her current husband. Davis's complaint is not based on one discrete action such as a direct threat to take action against her if she did not cooperate sexually, but on an ongoing course of conduct.

Wal–Mart also attempted to show that Patterson's actions might have been welcome. Wal–Mart attempted to show that Davis had asked Patterson to give her away at her wedding, which Davis denied. Wal–Mart also called as witnesses co-workers who said that Davis had not complained to them about Patterson. Wal–Mart also points out that Davis asked to return to Marble Falls, where Patterson was the manager. As noted above, however, Davis, a single parent, returned to Marble Falls because of family reasons.

### How Bad is Bad Enough?

Although actionable sexual harassment must affect a "term, condition or privilege" of employment, the Supreme Court has held that

> this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor,* 477 U.S. at 64, 106 S.Ct. 2399). For actions to be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, they must be more than merely offensive but need not rise to the level of conduct that causes a tangible psychological injury. *Id.* at 21–22, 114 S.Ct. 367. A sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive and one that the victim actually perceived to be so. *Id.* There is no mathematically precise test for when a work environment is hostile or abusive; instead, it must be judged on all of the circumstances of each case, which may include such factors as the frequency of the conduct, whether it was physically threatening or humiliating conduct or a mere offensive verbal comment, whether it unreasonably interfered with the victim's performance, and whether it caused psychological harm. *Id.* at 22–23, 114 S.Ct. 367.

Specific instances of Patterson's conduct toward Davis and other women have been detailed earlier in this opinion. There is no evidence that Patterson engaged in the same or similar kinds of conduct with the men in the store. Davis testified that Patterson treated the men in the store with more re-

spect. For example, he would give comparably situated male employees written notes about tasks to be done, but would force Davis to remember his list of instructions.

Davis testified that Patterson's conduct caused her to feel humiliated. She testified that his conduct at the first coaching shocked her. She began having problems sleeping and eating after this incident. Davis testified that her treatment at Wal–Mart made her sick to her stomach and nervous, gave her headaches, and resulted in an increased need for time off. Eventually, she collapsed at work, left Wal–Mart in an ambulance, and never returned. There was expert testimony that she had suffered permanent impairment of her work-related functioning. Paula Stritmatter concluded that, based on the reported activities at Wal–Mart, such as the spanking of female employees and sitting in laps of female employees, a sexually hostile environment existed and continued after Patterson's transfer because of the lack of educational efforts.

, Although Patterson's actions were not as extreme as some that have been reported,[11] when evaluated in light of the factors as set out in *Harris,* there was more than a scintilla of evidence to support the existence of an actionable hostile environment claim. Patterson was Davis's supervisor. As noted in *Ellerth,* "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character...." *Ellerth,* —— U.S. at ——, 118 S.Ct. at 2269, 141 L.Ed.2d at 654. Patterson was in contact with Davis every day. He was described as a physically large man; it was not unreasonable that his attempts to detain Davis in her chair with his hands on her upper thighs would leave her in fear of further assault if she did not take some action. Patterson's actions had a severe impact on Davis, causing a high level of stress and possibly permanent psychological damage.

Title VII is not a general civility code for the workplace. *Oncale v. Sundowner Off-*

*shore Servs.,* 523 U.S. 75, ——, 118 S.Ct. 998, 140 L.Ed.2d 201, 207 (1998). Title VII is not designed to rectify every unpleasant aspect of one's co-workers' or supervisors' behavior. However, it comes into play before harassing workplace conduct induces a nervous breakdown. *Harris,* 510 U.S. at 22, 114 S.Ct. 367. In *Gallagher v. Delaney,* 139 F.3d 338, 342 (2d Cir.1998), the court noted that recognition of employees' dignity might require standards higher than those of the street, and that reasonable people can take justifiable offense at comments that the vulgar among us, even if they constitute a majority, would consider acceptable. The court went on to say:

> Today, while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogeneous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation.

*Id.* We think the jury was the appropriate body to determine whether Patterson's conduct was "bad enough" to be actionable, and we hold that there was more than a scintilla of evidence to submit the issue to the jury. We overrule point of error two.

## DAMAGES AND ATTORNEY'S FEES

### *Compensatory Damages*

■ In point of error five, Wal–Mart contends the jury's damage awards for medical expenses and mental anguish in the harassment damage question are not supported by legally sufficient evidence because there is no finding of an intentional statutory violation by Wal–Mart. In point of error ten, Wal–Mart challenges the factual sufficiency of the evidence to support the jury's award for medical expenses and mental anguish. We look once again to federal cases dealing with sexual harassment to determine the meaning of "intent" as used in the Texas Labor Code.

---

11. *See, e.g., Borg–Warner Protective Servs. Corp. v. Flores,* 955 S.W.2d 861 (Tex.App.—Corpus Christi 1997, no pet.) (rape); *Meritor,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (sexual intercourse and allegations of rape). *But cf. Harris,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (no discussion of any physical contact, objectionable conduct apparently limited to verbal harassment).

**44**

*See* Tex. Lab.Code Ann. § 21.2585(a) (compensatory damages may be awarded on finding that employer "engaged in an unlawful intentional employment practice as alleged in a complaint").

We believe "intent" in the Labor Code was used to distinguish between disparate impact and disparate treatment cases. A plaintiff can establish discrimination based on either disparate impact or disparate treatment. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 985–87, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Disparate impact cases involve facially neutral practices, such as aptitude tests and education requirements, that operate to exclude a disproportionate percentage of persons in a protected group and cannot be justified by business necessity. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In disparate impact cases, a plaintiff must show merely that an employer's practices are discriminatory in operation—a showing of discriminatory intent is not necessary. *Watson,* 487 U.S. at 984–85, 108 S.Ct. 2777.

Disparate treatment, on the other hand, involves a factual inquiry into whether the defendant intentionally discriminated against the plaintiff, that is, whether the employer treats some people less favorably than others because of their race, color, religion, sex, or national origin. *Jones v. Flagship Int'l,* 793 F.2d 714, 719 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). In 1991, the Civil Rights Act was amended to include section 1981a, which for the first time provided that a successful plaintiff in a discrimination case could sometimes recover compensatory and punitive damages. This section reads in part:

> In an action brought by a complaining party under [federal discrimination laws, including Title VII] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) ... the complaining party may recover compensatory and punitive damages . . . .

42 U.S.C.A. § 1981a(a)(1) (West 1994).

As stated above, disparate treatment cases can be divided into two groups: quid pro quo cases and hostile work environment cases. In listing the five necessary elements of a hostile work environment, courts have subsumed the requisite intent within the other five elements, particularly that the harassment was based on gender. As noted by one court:

> In contrast [to other disparate treatment cases], the case of sexual harassment that creates an offensive environment does not present a factual question of intentional discrimination which is at all elusive. Except in the exceedingly atypical case of a bisexual supervisor, it should be clear that sexual harassment is discrimination based upon sex.

*Henson v. City of Dundee,* 682 F.2d 897, 905 n. 11 (11th Cir.1982); *accord Jones,* 793 F.2d at 719 n. 5 (quoting *Henson* ).[12] It seems clear that the intent of the provision allowing for recovery of compensatory damages based on an intentional practice was to distinguish disparate treatment from disparate impact. There is no dispute that Davis's claim is based on Patterson's conduct directed at her and other women, not some facially benign Wal–Mart employment practice.

Wal–Mart argues that the jury's failure to find that Wal–Mart acted with malice or reckless indifference conclusively shows that Wal–Mart's conduct was not intentional. "Malice" and "reckless indifference" are findings necessary to support punitive damages, which were not awarded to Davis. We overrule point five.

In point of error ten, Wal–Mart challenges the factual sufficiency of the evidence to support the jury's award of compensatory damages for mental anguish and medical expenses. Wal–Mart's primary challenge centers on the causal link between Patterson's action and Davis's injury. We have already detailed Davis's testimony con-

---

**12.** After *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), which involved same-sex sexual harassment, the analysis may not be so easy. However, the present case involves "traditional" male-towards-female sexual harassment.

cerning the effect of the harassment on her. Wal–Mart adduced testimony to suggest that Davis's distress was caused by a difficult, abusive marriage. One of her co-workers claimed that Davis said her husband had caused a bruise on her hand. Davis denied that allegation. In cross-examining Davis's expert psychologist, Wal–Mart explored difficulties that Davis had with one of her children, suggesting that was the cause of her problems. The psychologist's opinion, however, was that the stress on Davis caused by Wal–Mart was a contributing factor to her having less attention to give her children. The jury believed Davis and her witnesses, as was its perogative. The verdict is supported by legally and factually sufficient evidence. We overrule point of error ten.

### Front Pay

■ The judgment awarded Davis "equitable relief for future pay or loss of earning capacity." In point of error eight, Wal–Mart complains that the TCHRA does not specifically provide for the "front pay" awarded to Davis in the judgment. This Court has already held that "a trial court's award of front pay constitutes a legitimate exercise of its equity powers" under the Act. *See Gifford,* 824 S.W.2d at 743–44; *Borg–Warner,* 955 S.W.2d at 867; *see also Stanley Stores, Inc. v. Chavana,* 909 S.W.2d 554, 561–62 (Tex. App.—Corpus Christi 1995, writ denied).

■ Front pay refers to future lost earnings. *See Borg–Warner,* 955 S.W.2d at 867; *Hansard v. Pepsi–Cola Metro. Bottling Co.,* 865 F.2d 1461, 1469 (5th Cir.), *cert. denied,* 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). To recover front pay, a plaintiff must show that reinstatement is not feasible as a remedy. *Hansard,* 865 F.2d at 1469. The court must determine whether front pay is allowed; the jury determines the amount. *Id.* at 1470.

In this case, the court determined all matters concerning front pay. At trial, Davis's expert was asked if he had calculated lost back pay and lost front pay. The answer was that if those items were the same as loss of past and future earnings and benefits, he had. Davis's expert psychologist testified that it was not only impractical for Davis to

be reinstated at Wal–Mart in the short term, he would recommend against it even as a long-range goal. He testified that Davis would never return to the level of functioning she experienced before the harassment. He testified that, over a five-year period, Davis's functioning would improve to a maximum of seventy-five percent of her previous functioning and earning ability. An economist testified as to the discounted present value of her future pay. We hold the award of front pay was permitted under the Act, and that sufficient evidence in the record exists to uphold the award. We overrule Wal–Mart's eighth point of error.

### Attorney's Fees

■ In point of error six, Wal–Mart contends that attorney's fees cannot be awarded because no legally sufficient evidence supports Davis's statutory claim under the Act and, therefore, the tort claims cannot form a basis for the award of attorney's fees. In the alternative, it argues that the fees awarded were grossly excessive.

We have already found legally and factually sufficient evidence to uphold Davis's statutory claim under the Act. Lab.Code § 21.259. Accordingly, we hold an award of attorney's fees proper.

Davis introduced expert testimony that the billing rate charged by her attorneys was not only reasonable, but somewhat on the low side for employment litigation. Davis's expert testified that employment law cases are discovery intensive and that the total fees were reasonable and necessary in this case in view of the discovery disputes and motions regarding such disputes. Wal–Mart presented no controverting testimony on attorney's fees. We overrule point six.

### DAVIS'S TORT CLAIMS

In points of error three, four, and eight, Wal–Mart contends there is no evidence to support recovery for assault or invasion of privacy and challenges the definition of "ratification" submitted to the jury. The judgment limited Davis to one recovery for her injury. There is no "double recovery" issue. *Cf. Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7–8 (Tex.1991). We have already

sustained Davis's recovery based on the sexual harassment claim. Thus, a resolution of the tort claims is not necessary to the disposition of the case and we will not address the issues concerning those claims. Tex.R.App. P. 47.1 (court must hand down written opinion that addresses every issue raised and *necessary* to final disposition of appeal).

## SANCTIONS FOR DISCOVERY ABUSE

▇▇▇▇▇ In point of error eleven, Wal-Mart contends that the trial court judge abused his discretion in levying monetary sanctions against Wal-Mart for discovery abuse.[13] We review a trial court's award of attorney's fees as a sanction for discovery abuse using an abuse of discretion standard. *Brantley v. Etter,* 677 S.W.2d 503, 504 (Tex. 1984). The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles, that is, whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The mere fact that a trial judge may decide a matter within the court's discretionary authority in a different manner than would an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

▇▇▇▇▇ The purposes of discovery sanctions are to: (1) secure the parties' compliance with the rules of discovery; (2) deter other litigants from violation of the discovery rules; and (3) punish parties who violate the discovery rules. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex.1992). Discovery sanctions must be just. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). Whether a sanction is just is measured by two standards. First, there must be a direct relationship between the offensive conduct and the sanction imposed. *Id.* Second, sanctions must not be excessive. A sanction should be no more severe than necessary to satisfy its legitimate purposes; a court should consider the availability of less stringent sanctions and wheth-er less stringent sanctions would fully promote compliance. *Id.*

Wal-Mart argues that Davis manipulated the rotating docket system in Travis County and, in essence, finally found a judge to "sign off" on a sanctions order. However, the well-developed record shows a pattern of smaller initial sanctions, warnings, a failure to secure compliance, and then increased sanctions.

The trial court initially sanctioned Wal-Mart for $500 after an April 1995 hearing on Davis's motion to compel. In September, 1995, Judge Scott McCown, at a hearing on Davis's second motion to compel, warned Wal-Mart:

> I think what [Davis's trial counsel] would say is that I was too easy on you-all in April and his subsequent problems are a result of my—my view that most of these problems aren't intentional and that he would say I am being too easy on you again today and you keep bringing in new lawyers here. Don't screw up anymore because I am at the end of my mercy.

In April 1996 Judge Paul Davis heard evidence concerning Davis's motion for sanctions.[14] At that hearing, Davis's counsel testified concerning the attorney's fees and costs incurred in taking depositions and in pursuing the third motion for sanctions. He testified that the deponents in question were unable to provide answers in many of the significant categories of testimony in which Wal-Mart had designated them to testify. Judge Davis did not allow all of Davis's requested costs and attorney's fees, concluding that Davis had received some benefit from the depositions. His April 10, 1996 order sanctioned Wal-Mart for $16,442.69 for the costs associated with the depositions and $3,500 for the costs associated with pursuing the motion to compel. At the conclusion of the hearing, Judge Davis vigorously admonished Wal-Mart:

> I have what I refer to as my "one bite at the apple rule." Wal-Mart, it seems to me, has had several bites at the apple so far, but not before me.

---

13. Wal-Mart does not challenge any other aspect of any of the sanctions orders.

14. Judge Paul Davis and Wendy Davis are not related.

And I'm putting Wal–Mart on its best behavior. I'm telling Wal–Mart, you better fully, totally and absolutely cooperate in the resolution of this case by a trial that's scheduled shortly.

I'm telling Wal–Mart that we're not going to play games with discovery in this lawsuit anymore. We're not going to play trick questions. We're not going to play trick responses.

We're not going to say that somebody is going to testify about something and then have that person who appears not know anything about it. We're not going to drag our feet. We're going to get on with the business as it ought to be gotten on with in order to get this case resolved. If you don't, additional and more serious sanctions will be assessed. It's time to stop the gamesmanship.

In June 1996 Judge Davis signed an order sanctioning Wal–Mart $100,000 for attorney's fees, costs, and expenses. Judge Davis's June order details Wal–Mart's violations of his April 1996 order. For example, Wal–Mart had been ordered to produce its "Coaching for Improvement & Success" manual. Instead it produced an associate's manual, representing that they were "substantially the same." The court's order notes that, in fact, the associate's manual contains one-half page of material on sexual harassment and the coaching manual contains nine pages. After the April order, Wal–Mart produced a manual, but not the one in effect at the time of Patterson's actions. Expressly finding that Davis had been harmed by not having the relevant manual available during depositions in order to ascertain whether Wal–Mart followed its own policies, the court ordered that the version of the coaching manual produced by Wal–Mart on May 29, 1996 would be admissible and would be deemed the version in effect during the relevant time period. The order continues at this level of detail about Wal–Mart's violations and their connection to the harm inflicted for another four single-spaced pages, concluding:

Rarely has this Court seen such a pattern of deliberate obfuscation, delay, misrepresentation, and downright lying to another party and to a Court. The Court is shocked at this behavior, and said so in its April 10, 1996 Order. Wal–Mart has not heeded those warnings, despite having been given more than ample opportunity to do so.

The final sanction imposed was large. However, the amount alone does not render the order unjust. The order was the culmination of a series of orders and sanctions. The court not only considered, but tried, lesser sanctions. In its April 10 order, the court did not simply assess all of the costs associated with the complained of behavior against Wal–Mart; it attempted to ascertain what value Davis derived in spite of the abuse. As the series of orders shows, lesser sanctions did not deter Wal–Mart's abuses.

The court held a hearing before imposing the final sanctions. It had before it evidence from Davis's attorney and Davis's expert on attorney's fees concerning the fees and costs incurred due to Wal–Mart's discovery abuse. The final order carefully links the requested discovery, the specific abuse or abuses associated with that discovery request, and the harm to Davis. We hold that the discovery sanctions imposed are just under the *Trans-American* analysis. We overrule point of error eleven.

### CONCLUSION

Having overruled all points of error, we affirm the judgment of the trial court.