Opinion issued July 27, 2006 


















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-00678-CV
__________

THE CITY OF HOUSTON, Appellant

V.

SAM LEVINGSTON, D.V.M., Appellee
 

 
 
On Appeal from the 125th District Court
Harris County, Texas
Trial Court Cause No. 2000-24777
 

 
 
OPINION ON REHEARING
          We grant appellant’s motion for rehearing, withdraw our opinion dated
February 2, 2006, and substitute this opinion in its place.
          In this Texas Whistleblower Act


 lawsuit, appellant, the City of Houston (“the
City”), challenges the trial court’s judgment, rendered after a jury verdict, awarding
appellee, Dr. Sam Levingston, $116,500 in past lost wages, $235,000 as the value of
reinstatement to Levingston’s former position, fringe benefits and seniority rights,
and $250,000 in capped compensatory damages, plus attorneys’ fees, pre- and post-judgment interest, and court costs.
          In three of its seven issues, the City contends that there is no evidence to
support the jury’s findings that Levingston, in good faith, reported a violation of law
to an appropriate law enforcement authority, that the termination of Levingston’s
employment was caused by the report, and the jury’s award of mental-anguish
damages. In its remaining issues, the City contends that the trial court erred in
awarding Levingston the monetary value of reinstatement to his former position
without subjecting that award to the applicable statutory damages cap; awarding
Levingston prejudgment interest on his capped compensatory damages; applying a
“multiplier” to its award of Levingston’s attorneys’ fees; denying the City’s request
to include a separate question in the jury charge regarding the City’s affirmative
defense; and denying the City’s pretrial motion to strike Levingston’s untimely
request for a jury trial.
          We modify the trial court’s judgment to provide for the award of prejudgment
interest on the amount of $116,500 rather than on the amount of $365,500. We affirm
the judgment of the trial court in all other respects.
Factual and Procedural Background
          Dr. Levingston served the City as a senior veterinarian in its Bureau of Animal
Regulation and Care (“BARC”), a division of the City’s Department of Health and
Human Services, from September 8, 1992 until his employment was terminated on
March 23, 2000. Prior to his termination, Levingston had over 40 years of experience
as a licensed veterinarian. 
          BARC, previously known as “the City of Houston Rabies Control Facility,” has
the responsibility for the control of rabies within the City.


 The record reveals,
moreover, that “BARC has law enforcement responsibilities in animal-related issues
within the City.” The BARC facility intakes approximately 28,000 to 30,000 animals
in a given year. Out of these animals, approximately 25,000 are euthanized by
BARC, and another 120 to 140 animals are dead on arrival or die of natural or
unexplained causes while in BARC’s care. 
          At trial, Levingston testified that during his employment with BARC, he saw
“a number of things” occurring at BARC’s facility that “rose to the level of animal
abuse.” Among other problems, he noted that individual pens in the BARC kennel
were too small and overcrowded and that this caused animals to fight over food. He
also noted that when the air conditioners on BARC trucks did not work, animals
would arrive at the BARC facility heated, exhausted, and sometimes dead. 
          Levingston stated that BARC kennel attendants, in a cruel and inhumane
manner, held animals in a dip tank with their heads under water “to teach them a
lesson.” He saw BARC kennel attendants jerk dogs off of BARC trucks onto a
concrete floor, which would “create painful breaks.” Levingston also saw BARC
kennel attendants pitch puppies “like a baseball from the truck to the holding pen,
which had a concrete floor.” He explained that when mother dogs were brought into
the BARC facility, their puppies, due to a “faulty floor,” would often get stuck down
into a four inch drain. On one occasion, BARC kennel attendants washed three
puppies down the sewer line. Levingston also stated that cats were sometimes
“euthanized in burlap sacks by throwing them under the back wheels of a truck.”


 He
also explained that BARC employees did not properly feed and water animals, that
they would ration food for animals scheduled to be euthanized, and that “the attitude
was, ‘Well, they’re only going to be here three days, so they’ll either go home or
they’ll be euthanized, so why waste the food on them?’” 
          Levingston further testified that he reported these matters to the attention of
John Nix, the Division Manager of BARC, from the time that Nix became Division
Manager in September 1996 until May 21, 1999. He normally communicated his
complaints to Nix by periodically leaving Nix notes written on 5-inch by 8-inch index
cards. Levingston would complete an index card when he “found the abuse,”
typically at the end of his workday between 4:00 and 7:00 p.m. He had to leave Nix
written reports because Nix typically left the BARC facility at 2:00 p.m. on business
days. Levingston explained that animal abuse at BARC grew worse after Nix became
Division Manager because, unlike his predecessor, who “was in the kennel every
single day,” Nix was in the kennel only “twice a month” as he walked “through to
pick up a city vehicle.” Despite his complaints, Levingston “never saw a change” at
BARC.
          In May 1999, Levingston decided to handwrite a formal letter outlining his
complaints to Nix because his complaints about animal abuse were being “ignored.” 
Levingston was concerned that his written reports “probably had been thrown away
without any action taken, so [he] wanted this letter typed and placed in [his] file and
to show evidence of the inhumane treatment.” When Levingston spoke with his
direct supervisor, Dr. Adel Hanna, who was also a senior veterinarian at BARC, about
Nix’s failure to respond to his complaints, Hanna told him that “Nix was getting kind
of irritated because [Levingston] was giving him so many cards and talking so much
about the inhumane treatment of animals.” On May 20, 1999, Levingston gave his
handwritten letter, which was to be dated May 21, 1999, to the kennel’s secretary. 
          In the letter, Levingston offered suggestions for improving the operation of the
facility, proposed changes, and noted: 
The animals are treated inhumanely including—by improper restraints,
a lack of water and sometimes food, and rough handling by uncaring
employees—this should be corrected before the SPCA or another
humane organization finds out. 
When asked why he made all of his reports to Nix at BARC and “not somewhere
else,” Levingston testified: 
It’s against the law to treat the animals inhumanely. This is the authority
for which the inhumane treatment should be reported to. And it’s the
law.
He explained that, as a BARC senior veterinarian, he in fact “did go out a few times
to investigate animal abuse with a team from BARC.”  
          Nix testified that although he did not recall discussing animal abuse at BARC
with Levingston before receiving Levingston’s May 20 letter, his recollection could
be wrong. Nevertheless, in a “confidential” memorandum to Levingston dated June
1, 1999, Nix stated that he had reviewed Levingston’s handwritten memorandum,
which was delivered to him on May 24, 1999, and was “greatly disturbed” by
Levingston’s allegations. Nix further stated that he had “initiated an investigation of
these allegations” and requested “specific detail in order to initiate appropriate action
against parties who participate in such mistreatment.” 
          Levingston then replied to Nix’s memorandum in a June 3, 1999 handwritten
letter, noting, among other things, that during his daily observation walks in the
kennel, he saw mother dogs and cats with their young without food and water almost
daily. He also noted that he had previously advised Nix “many times” of problems
with the performance of the Kennel Master, Robert Trottie, who supervised the
kennel attendants, and that he had been doing Trottie’s job “for the last two years.” 
Although Levingston never heard back from Nix in regard to his June 3 letter,
Levingston continued to supply Nix with his written complaints about the care of
animals in the kennel and the treatment of specific animals. He did this until he
received a September 1, 1999 letter from Dr. Margaret Kendrick, the Director of the
City’s Department of Health and Human Services, advising him that Nix had
recommended that his employment be terminated. 
          In the letter, Kendrick notified Levingston that it was “alleged that [he] 
directly violated BARC’s policy regarding negligence in the treatment of animals
resulting in unwarranted suffering and death.” Specifically, she cited “the deaths of
a female Rottweiler from complications due to an uterine infection and hemorrhage
on May 6, 1999 and a quarantined Great Dane on July 22, 1999.” The letter noted
that a meeting had been scheduled for later that month. Levingston testified that
Hanna had received a similar letter and that they were “shocked and both ill at the
same time” because the letters were unexpected. Nix had never disciplined or even
spoken with Levingston about his treatment of either animal, and Levingston had
received “strong” performance evaluations in regard to his service. 
          The record reveals that instead of initiating an investigation of Levingston’s
animal abuse allegations as represented by Nix in his June 1, 1999 memorandum to
Levingston, Nix, who was not a veterinarian, wrote a memorandum on June 10, 1999
to Dr. Ardath Payne, the Assistant Director of the Department of Health and Human
Services, recommending that both Levingston and Hanna be indefinitely suspended
from BARC because they were “negligent in the treatment of [a] female Rottweiler.” 
Nix based his recommendation on a June 2, 1999 report


 of Hannie Simmons,
BARC’s Animal Control Officer Supervisor, who, at Nix’s direction, investigated the
death of the Rottweiler. Nix felt his recommendation to suspend the veterinarians
indefinitely was “appropriate” because a 1975 court order,


 to which the City and
BARC had agreed, “expressly state[d]” that the City and BARC had
a specific and certain public duty to handle and maintain such animals
impounded [by BARC] or animals being picked up or carried to said
facility by individuals under [BARC’s] supervision and employ or at
their direction, in a manner such as to avoid any act, omission or neglect
which causes any unnecessary or unjustifiable pain or suffering or
permits or allows such pain and suffering to continue when there is a
reasonable remedy.
Nix also relied on another provision of the agreed order that provided:
[T]hat all persons in supervisory positions at [BARC] take appropriate
steps to discharge any persons whose actions or failure to perform their
assigned duties in a reasonably efficient manner results in the inability
of [BARC] to effectively implement this order.
          Simmons testified that Nix had ordered him to investigate the death of the
female Rottweiler, but not the death of the Great Dane. After interviewing several
witnesses, including kennel attendants and the veterinarians, Simmons learned that
the Rottweiler and her nine puppies had been delivered to BARC on April 28, 1999. 
Two kennel attendants told Simmons that on April 30, they told Levingston that the
dog was bleeding, and he told them to inform Dr. Abigail Arredondo


 to examine the
dog. Another kennel attendant told Simmons that, on May 2, he told Hanna of the
dog’s condition. Hanna treated the dog for diarrhea with an oral medication and
contacted the owner, who told Hanna that he would pick up the dog and the puppies
on May 3. Another kennel attendant told Simmons that, on May 3, the dog was
bleeding, and he notified Hanna, who examined the dog and told Rollins that the
owner was supposed to pick up the dog. Hanna told Simmons that, on May 4, he
observed the dog to be “normal, alert and moving around,” and he again tried to
contact the owner. 
          On May 6, a kennel attendant informed Nix that he should take a look at the
dog. Nix directed Levingston to treat the dog. Levingston treated the dog with
subcutaneous fluids and tried to contact the owner. A kennel attendant found the dog
dead in its pen the next morning, and the remaining puppies had to be euthanized. 
Hanna informed Nix that the only treatment for the dog’s condition would have been
a hysterectomy, but the owner would have had to agree to the surgery. 
          In his June 2 report, Simmons concluded that the evidence indicated that
“members of the clinic staff were negligent and derelict by failing to follow up on the
dog in question even after they were aware of the dog’s condition for at least six
days.” Simmons, who is not a veterinarian, opined that the “veterinarians failed to
ensure the animal was treated in a manner which would have provided it an
opportunity to survive its illness” and the “animal was left to suffer for a period of
over 24 hours due to a lack of examination and treatment.” 
          Simmons testified that although he had “generally” heard from within BARC
that Levingston had made complaints about the treatment of animals at BARC, the
first time that Simmons became aware that Levingston had communicated his
complaints to Nix was on August 5, 1999, when Simmons found, in the doorway of
Nix’s office, one of Levingston’s written reports complaining of a lack of food and
water for certain animals. Although Nix testified that he had asked Simmons to
investigate Levingston’s allegations of animal abuse at BARC, Simmons testified that 
Nix never “asked [Simmons] to look into inhumane treatment of animals as alleged
by Levingston.” Simmons explained that in his 18 years of experience at BARC, he
had never been asked to investigate animal abuse and neglect by a kennel attendant
or clinical staff. In fact, Levingston’s was the first instance of which he was aware
involving a BARC investigation into a clinic staff member’s treatment of an animal. 
Although Simmons had investigated between 20 and 25 instances of mistreatment of
animals by animal control officers, he found some evidence of mistreatment in only
three cases, and none of the animal control officers involved in the instances were
indefinitely suspended. 
          The Great Dane, to which Kendrick’s letter referred, was admitted to BARC
and placed in quarantine for suspicion of rabies because it had bitten a United States
Postal Carrier. Dr. Jesus Martinez,


 a veterinary technician supervisor, testified that
he told Levingston on July 22, 1999 that the dog “was foaming from the mouth” and
that he noticed “a lot of vomit around the mouth and going down to the . . . legs.” 
Although Martinez expected Levingston “to check” the dog, Levingston told him that
the dog was “okay.” The dog died the following day. On July 23, 1999, Nix reported
the death of the Great Dane to Payne and stated:
The dog exhibited some signs of illness yesterday but did not appear to
be in a condition which would cause its death last night. A veterinarian
examined the animal yesterday and found no cause for alarm as to
rabies.

Subsequent testing revealed that the dog was not rabid. However, based on
Martinez’s representations, Nix, on July 26, 1999, wrote another memorandum to
Payne stating that Levingston “did not personally examine the dog” and that there
“was no treatment given the dog.” He also noted that Levingston “did not speak with
the owner to tell him that the dog had died and the owner came to BARC late in the
afternoon to reclaim the dog.” Nix concluded that Levingston’s “failure to follow
procedure caused undue stress and discomfort to employees at BARC who are not
responsible to advise the owner of such a death.” In his trial testimony, Nix conceded
that he had “zero evidence of wrongdoing against Levingston that he in any way,
shape or form caused the death of the Great Dane.”  
          Kendrick, who was a medical doctor and not a veterinarian, testified that she
sent the September 1, 1999 letters to Hanna and Levingston to advise them that it had
been recommended that their employment be terminated and to give them a chance
to respond to the charges against them in a Loudermill


 hearing set for September 17,
1999. Due to medical complications associated with his receipt of the letter,
Levingston’s hearing was postponed until January 7, 2000. After Hanna’s September
17 hearing, Kendrick recommended to then Mayor Lee P. Brown that Hanna be
indefinitely suspended. Hanna then chose to retire in lieu of being indefinitely
suspended.
          In late October 1999, the City hired Dr. Nick DeWees to write a report about
the deaths of the Rottweiler and the Great Dane. DeWees testified that he obtained
his degree in veterinary medicine and became a licensed veterinarian in May of 1998.
In his report to Kendrick, dated November 15, 1999, DeWees stated:
The information provided to me concerning Dr. Levingston’s
management of the female Rottweiler, with vaginal bleeding, in my
opinion showed gross neglect for animal welfare. . . . [The dog] was not
appropriately attended to. Simple laboratory tests, such as a hematocrit
or total serum protein, could have identified if this dog was suffering
from severe blood loss from either the reproductive tract or the
gastrointestinal tract. . . . [T]his dog in my opinion had a severe medical
condition and was in moderate pain and could have been justifiably
euthanized prior to May 6, 1999. The second course of action would
have been to institute the medical care and diagnostics necessary to
safeguard the dog’s well being until the dog was better or the owner
specifically refused such treatment. . . . Post-partum bleeding of this
magnitude should have alerted a reasonably trained veterinarian of the
potential for a retained fetus, retained fetal membranes, or a ruptured
uterus. . . . If the discharge was thought to be fecal in origin then why
was the dog not tested for Parvoviral enteritis? 
In regard to the Great Dane, DeWees stated:
Examining an animal through a fence does not allow one to accurately
assess what type of problem the dog may have. Potentially the dog had
a Bordatella or a Parainfluenza infection, which leads to “Kennel
Cough.” This is a very common problem in animal containment
facilities. . . . [Regarding Dr. Levingston’s concern about] a twisted
intestine, which is more correctly known as gastric dilation and volvulus
or GDV, . . . GDV can be easily diagnosed and if diagnosed in time
surgery can be life saving. A diagnosis of GDV is made definitively by
taking a radiograph of the abdomen. Given a good physical exam,
knowing the breed and clinical symptoms a diagnosis can be frequently
made without radiographs.

DeWees concluded:
 
The management of the Rottweiler can definitely be seen as malpractice
and could be subject to civil and state regulatory action if it occurred in
private practice. . . . Failure to give the Great Dane a physical
examination is evidence of negligence.

          . . . .
 
These incidents, coupled with past disciplinary actions, certainly warrant
strong disciplinary action now. If these events were to take place in my
hospital or any of my colleague’s hospitals I feel the proposed
disciplinary action would be similar to that given in the private sector. 
 
          Kendrick testified that she conducted Levingston’s Loudermill hearing on
January 7, 2000 and then recommended to Mayor Brown that Levingston’s
employment be terminated. In her testimony, Kendrick conceded that it was “most
likely” that Levingston’s employment would not have been terminated but for Nix’s
recommendation of indefinite suspension. 
          In his March 23, 1999 letter informing Levingston of his indefinite suspension
from BARC, Mayor Brown, apparently relying heavily on DeWees’s report,
specifically noted, in regard to the Rottweiler, that 
[Levingston] never ordered or requested any laboratory tests, even those
normally indicated for any post-partum animal with a medical problem.
. . . [I]t was Dr. Levingston’s duty and responsibility to timely and
appropriately order treatment or euthanasia for the animal. 
In regard to the Great Dane, Mayor Brown noted:
A visual assessment of an animal through a fence or a pen does not
allow one to accurately assess what type of problem an animal may
have. It certainly does not allow a dog to be examined for a Bordatella
or Parainfluenza infection which can lead to “Kennel Cough.” Kennel
Cough is a common problem with large dogs in animal containment
facilities. 
Mayor Brown explained that Levingston’s actions violated the City’s policy that 
employees “give a productive day’s work to the best of their abilities and skills.” He
also explained that Levingston’s actions violated various provisions of “the Texas
Administrative Code governing the Rules of Professional conduct for Veterinarians
as established by the Texas State Board of Veterinary Medical Examiners.” In regard
to the Loudermill hearing, Mayor Brown concluded that because Levingston’s
explanations to Kendrick were “not satisfactory” and because “previous disciplinary
actions have failed to correct his unacceptable and unprofessional conduct,” Kendrick
“was left with no alternative” but to “recommend infinite suspension for Levingston. 
I concur with this recommendation.” 
           On March 30, 2000, Levingston appealed to the Civil Service Commission for
Municipal Employees, which, on April 13, 2000, upheld the indefinite suspension. 
Levingston then filed this lawsuit on May 19, 2000. Kendrick reported Levingston’s
conduct in regard to the Rottweiler and the Great Dane to the Texas State Board of
Veterinary Medical Examiners, which closed the case with “no violations found.” 
          The jury found that Levingston’s reports to BARC “of torture, unreasonable
failure to provide necessary food or care, and/or transport or confinement in a cruel
manner of animals in the custody of the City of Houston” were made “in good faith”
and were “a cause of the City of Houston’s terminating his employment when it did.” 
The jury awarded Levingston $116,500 for past lost wages, $250,000 for future lost
wages, $500,000 for past compensatory damages, and $375,000 for future
compensatory damages. 
          The City filed an amended motion for judgment notwithstanding the verdict,
contending that Levingston did not report a violation of law, did not make a report
to an appropriate law enforcement authority, produced no evidence that his alleged
reports caused his adverse employment action, and produced no evidence to support
the jury’s award on mental-anguish damages or its award for future pecuniary losses. 
The City also argued that the trial court erred in denying its proposed jury instruction
on its affirmative defense. 
          After a hearing to determine the “productivity” of reinstating Levingston, the
trial court, in its final judgment, awarded Levingston $235,000 as the “value of
reinstatement” to his “former position or an equivalent position, fringe benefits and
seniority rights lost because of the termination.” It also awarded Levingston
$116,500 for past lost wages, “compensatory damages capped at the amount of
$250,000,” $194,107.50 for attorneys’ fees, and $12,796.58 for court costs. The trial
court further awarded Levingston prejudgment interest “on the amount of $365,500”
and post-judgment interest on the entire amount of the judgment. 
Standard of Review
          A trial court may “disregard any jury finding on a question that has no support
in the evidence” and render a judgment nothwithstanding a jury’s verdict “if a
directed verdict would have been proper.” Tex. R. Civ. P. 301. In regard to the
City’s no-evidence issues,


 we note that when a party without the burden of proof
challenges the legal sufficiency of the evidence, we consider all of the evidence in the
light most favorable to the prevailing party, indulging every reasonable inference in
that party’s favor. Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d
276, 285–86 (Tex. 1998); Ned v. E.J. Turner & Co., 11 S.W.3d 407, 408 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied). If there is more than a scintilla of
evidence to support the challenged finding, we must uphold it. Formosa Plastics
Corp. USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). 
When the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence. Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.
1983)). However, if the evidence supplies some reasonable basis for differing
conclusions by reasonable minds as to the existence of a vital fact, then there is
legally sufficient evidence. King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003).
                                                                                                                                  Texas Whistleblower Act
          In its first and second issues, the City argues that the trial court erred in
denying its motion for judgment notwithstanding the verdict because Dr. Levingston
produced no evidence in support of the jury’s findings that (1) Levingston made a
report of what he believed, in good faith, was a violation of law to an appropriate law
enforcement authority and (2) this was a cause of the City’s termination of his
employment.


 
          The Texas Whistleblower Act (“the Act”) is designed to enhance openness in
government and to compel the government’s compliance with law by protecting those
who inform authorities of wrongdoing. See Davis v. Ector County, 40 F.3d 777, 785
(5th Cir. 1994) (quoting Castaneda v. Tex. Dep’t of Agric., 831 S.W.2d 501, 503
(Tex. App.—Corpus Christi 1992, writ denied)). The Act evidences two legislative
purposes: (1) to protect public employees from retaliation by their employer when,
in good faith, employees report a violation of the law and (2) in consequence, to
secure lawful conduct on the part of those who direct and conduct the affairs of public
bodies. Travis County v. Colunga, 753 S.W.2d 716, 718–19 (Tex. App.—Austin
1988, writ denied). Because the Act is remedial in nature, it should be liberally
construed to effect its purpose. Castaneda, 831 S.W.2d at 503; Davis, 40 F.3d at 785.
          The Act provides, in pertinent part, as follows:
(a)A State or local governmental entity may not suspend or terminate
the employment of, or take other adverse personnel action
against, a public employee who in good faith reports a violation
of law by the employing governmental entity or another public
employee to an appropriate law enforcement authority.
 
(b)In this section, a report is made to an appropriate law enforcement
authority if the authority is part of a state or local governmental
entity or of the federal government that the employee in good
faith believes is authorized to:
 
(1)regulate under or enforce the law alleged to be
violated in the report; or
 
(2)investigate or prosecute a violation of criminal law.

Tex. Gov’t Code Ann. § 554.002 (Vernon 2004). 
Good-Faith Belief 
           In its first issue, the City contends that Levingston failed to prove that “a
reasonably prudent veterinarian would have a good-faith belief” that he reported a
violation of law to an appropriate law enforcement authority. It asserts that in
denying its motion for judgment notwithstanding the verdict, the trial court
misinterpreted the precedent of Texas Department of Transportation v. Needham, 82
S.W.3d 314, 320–21 (Tex. 2002) and Wichita County v. Hart, 917 S.W.2d 779, 784
(Tex. 1996). 
          In regard to subsection (a) of section 554.002, the Texas Supreme Court held
in Hart that “‘good faith’ means that (1) the employee believed that the conduct
reported was a violation of law and (2) the employee’s belief was reasonable in light
of the employee’s training and experience.” 917 S.W.2d at 784. The test’s first
element—the “honesty in fact” element—ensures that an employee seeking a
Whistleblower remedy believed that he was reporting an actual violation of the law. 
Id. at 784–85. The test’s second element ensures that, even if the reporting employee
honestly believed that the reported act was a violation of law, the reporting employee
receive the Act’s protection only if a reasonably prudent employee in similar
circumstances would have believed that the facts as reported were a violation of the
law. Id. at 785. Thus, the Hart test includes both a subjective and objective element. 
        The Texas Supreme Court subsequently concluded in Needham that the same
test applies to determine, under subsection (b) of section 554.002, if a public
employee in good faith believed that the governmental entity to which he reported a
violation of law was an appropriate law enforcement authority. 82 S.W.3d at 320–21. 
Thus, in the context of section 554.002(b), “good faith” means that
(1)the employee believed the governmental entity was authorized to
(a) regulate under or enforce the law alleged to be violated in the
report, or (b) investigate or prosecute a violation of criminal law;
and 
 
(2)the employee’s belief was reasonable in light of the employee’s
training and experience. 

Id. at 321. 
          Violation of Law
          The City first argues, under Hart, that because of Levingston’s “training as a
licensed Veterinarian and his 40 years of experience, it was not reasonable for him
to believe that his complaints to Nix that the animals were not being fed, watered, and
handled properly; that the kennel master was not doing his job; and that kennel
employees needed to carry out their duties was a violation of any law, let alone the
animal cruelty statute.” (Emphasis added.) It asserts that “as a veterinarian,”
Levingston knew that “just because an animal’s food or water dish was empty, at any
given time, and in that one occurrence, was not an indication of animal cruelty.” 
          Relying on City of Houston v. Kallina, 97 S.W.3d 170, 175 (Tex.
App.—Houston [14th Dist.] 2002), the City asserts that in making the complaints,
Levingston was merely doing his job because he, “like Kallina, had a duty to report
mistreatment of animals.” Kallina, however, does not support the City’s argument
that Levingston produced no evidence in support of the jury’s finding that he made
a report of what he believed, in good faith, was “a violation of any law.” In the
portion of Kallina cited by the City, the court was concerned with whether an
employee’s “reporting violations of the City’s inventory procedures” entitled him to
protection under the Act. 97 S.W.3d at 174. The court noted that the employee
pointed to no City ordinances that were violated, but, rather, relied on two City policy
manuals that, he asserted, contained “rules adopted under an ordinance.” In
concluding that the employee was not entitled to the Act’s protection, the court
explained that it was “quite clear that these manuals (and the hundreds of pages they
contain) reflect internal policies rather than rules promulgated pursuant to an
ordinance.” Id. at 175.
          Although, as pointed out by the City, Levingston testified that his complaints
did concern employee performance failures and that he wanted Nix to take corrective
action, he further testified that “[i]t’s against the law to treat the animals inhumanely”
and that he, as a senior veterinarian at BARC, had occasions “to investigate animal
abuse with a team from BARC.” Specifically, Levingston notes that his reports to
Nix concerned the violation of certain provisions of the Houston City Code, the
Texas Penal Code, and the Texas Health and Safety Code.
          It is important to note that the very city ordinance that concerns the
responsibilities of the City’s Department of Health and Human Services and BARC
in regard to animals and fowl states that
[e]very . . . caretaker . . . of any animal within the city limits shall be
required to observe the following rules, regulations, terms and
conditions in connection with the care, keeping and using of such
animals, and any person violating any provisions hereof shall be deemed
guilty of an offense:
 
(1) All stables or other enclosures in which such animal is
kept and the ground upon which same is situated shall be
kept and maintained in a clean and sanitary condition, and
all stables and fences surrounding such lot where the
animal is kept and the feed troughs and water troughs, with
which such animals are fed and watered, shall be free from
any projection or thing whereon or whereby such animal
may be injured. 
 
(2) All animals shall be fed with a quantity of good,
wholesome food sufficient to keep them in a good, well-nourished condition, and such food shall be served to such
animals in a clean, sanitary manner.

                    . . . .
 
(9) All animals shall be provided with pure, clean water in
sufficient quantities at all times.

Houston, Tex., Ordinances ch. 6, art. I., § 6-6 (1), (2), (9) (emphasis added). The
City Code further provides that
 
[t]he violation of any provision of this chapter 6 is hereby declared to be
unlawful. Unless another penalty is expressly applicable as provided in
any section or subsection hereof, then a violation shall be punishable as
provided in section 1-6 of this Code and the provisions of section 1-6
are expressly invoked for such purpose. 

Id. ch. 6, art. I., § 6-1(c). Section 1-6(a) provides that “the violation of any such
provision of this Code or any such ordinance shall be punished by a fine not
exceeding $500.” Id. ch. 1, § 1-6(a). Many of Levingston’s reports to Nix against
BARC employees, including those reports concerning the deprivation of food and
water, the rationing of food, and the placement of animals in unsafe conditions in
which they were injured or killed, concerned the violation of the above cited
provisions of the City Code.
          Also, the Texas Penal Code prohibits much of the conduct that Levingston
reported to Nix. The Penal Code provides, in pertinent part, that a person commits
the offense of “Cruelty to Animals” if the person intentionally or knowingly
(1) tortures an animal;
 
(2) fails unreasonably to provide necessary food, care, or shelter for
an animal in the person’s custody;
 
. . . .
 
(4) transports or confines an animal in a cruel manner;
 
(5) kills [or] seriously injures . . . an animal . . . belonging to another
without legal authority or the owner’s effective consent;
 
(6) causes an animal to fight with another;
 
. . . .
 
(9) injures an animal . . . without legal authority or the owner’s
effective consent. 
   
Tex. Pen. Code Ann. § 42.09(a) (Vernon Supp. 2005). The term “cruel manner”
includes “a manner that causes or permits unjustified or unwarranted pain or
suffering.” Id. § 42.09(c)(3). “Necessary food, care, or shelter” includes “food, care,
or shelter provided to the extent required to maintain the animal in a state of good
health.” Id. § 42.09(c)(5). An offense under subsection (a)(2), (4), or (9) is a Class
A misdemeanor. Id. § 42.09(d). An offense under subsection (a)(1), (5), or (6) is a
state jail felony. Id. § 42.09(i). Many of Levingston’s complaints to Nix against
BARC employees concerned violations of the above provisions of the Penal Code,
including those involving the deprivation of food, the rationing of food, and the
placement of animals in unsafe conditions in which they were injured, caused to fight
over food, or killed. His report of transporting animals in BARC trucks with
defective air conditioners concerned violations of subsection (4). Levingston’s
allegations about kennel attendants’ holding the heads of animals under dip, jerking
dogs off of BARC trucks creating “painful breaks,” pitching puppies “like a baseball
from the truck to the holding pen,” and killing cats “in burlap sacks by throwing them
under the back wheels of a truck” concerned torture under subsection (1) and, in
regard to the cats, killing under subsection (5).
          Moreover, in regard to the treatment of “impounded animals,” the Texas
Health and Safety Code requires “a person who impounds or causes the impoundment
of an animal under state law or municipal ordinance” to “supply the animal with
sufficient wholesome food and water during its confinement.” Tex. Health &
Safety Code Ann. § 821.002(a) (Vernon 2003). If such an impounded animal
“continues to be without necessary food or water for more than 12 successive hours,
any person may enter the pound . . . as often as necessary to supply the animal with
necessary food and water.” Id. § 821.002(b). In regard to the disposition of cruelly
treated animals, an “officer who has responsibility for animal control in a county or
municipality” who has reason to believe that an animal is being “cruelly treated,” may
apply to a justice court or a municipal court for a warrant to seize the animal. Id. §
821.022(a) (Vernon Supp. 2005). The statute states that the term “cruelly treated”
includes “tortured, . . . unreasonably deprived of necessary food, care, or shelter,
cruelly confined, or caused to fight with another animal.” Id. § 821.021 (Vernon
2003). Here, Levingston’s reports to Nix about the deprivation of food and water and
the rationing of food concerned the violation of section 821.002. Also, under their
regulatory and enforcement function, the City’s animal control officers, under section
821.022, may obtain a warrant to seize “cruelly treated” animals. 
          Just because many of Levingston’s reports to Nix “concerned employee
performance failures” does not mean that his reports of the above cited instances did
not concern “a violation of any law.” The Act defines “[l]aw” as
(A) a state or federal statute;
(B) an ordinance of a local governmental entity; or
(C) a rule adopted under a statute or ordinance.
Tex. Gov’t Code Ann. § 554.001(1) (Vernon 2004). A criminal or “penal” statute
or law is “[a] law that defines an offense and prescribes its corresponding fine,
penalty, or punishment.” Black’s Law Dictionary 1421 (7th ed. 1999). Most of
the conduct described by Levingston constituted violations of criminal law. He
testified that the conduct was against the law and that he, as a BARC senior
veterinarian, had participated in the investigation of animal-abuse allegations with
other BARC employees. Here, the pertinent provisions of the Penal Code and the
City Code, which provide that “any person violating any provisions hereof shall be
deemed guilty of an offense” and assesses a fine of up to $500, are “criminal laws”
under the Act. Moreover, the above pertinent provisions of the Health and Safety
Code, concerning the treatment and disposition of animals, implicate the regulatory
and enforcement functions of BARC’s animal control officers. 
          We conclude that the City’s arguments that (1) it was not reasonable for
Levingston to believe that his complaints to Nix about animal abuse at BARC
concerned the violation of any law and that (2) Levingston failed to prove that “a
reasonably prudent veterinarian would have a good-faith belief” that he reported a
“violation of any law” are without merit. Levingston satisfied both the objective and
subjective elements of the Hart test. See 917 S.W.2d at 784–85. Accordingly, we
hold that the evidence is legally sufficient to support the jury’s implied findings that
Levingston, in good faith, believed that the conduct that he reported to Nix was a
violation of criminal law and also implicated the regulatory and enforcement function
of BARC and that his belief was reasonable in light of his training and experience.
          Appropriate Law Enforcement Authority
          The City next argues, under Needham, that because of Levingston’s education
and 40 years of veterinary experience, “it is simply not objectively reasonable” that
he, in good faith, believed that BARC had “police or enforcement powers.” It
contends that there was no evidence that Levingston’s “report of a violation of the
Penal Code to John Nix met the objective component of the definition of good faith
under the Act” and that there was “no credible evidence presented to the jury that a
senior veterinarian would have an objective good faith belief that BARC was an
appropriate law enforcement authority for the report of a violation of the penal code.”
          We note at the outset that the Act does not apply only to reports of criminal
offenses under the Texas Penal Code. Under the Act, an appropriate law enforcement
authority is a governmental entity authorized to “regulate under or enforce the law
alleged to be violated.” Tex. Gov’t Code Ann. § 554.002(b)(1) (Vernon 2004); 
Needham, 82 S.W.3d at 320. Alternatively, an appropriate law enforcement authority
is a governmental entity authorized to “investigate or prosecute a violation of criminal
law.” Tex. Gov’t Code Ann. § 554.002(b)(2); Needham, 82 S.W.3d at 319. It is not
enough that a governmental entity has general authority to regulate, to enforce, to
investigate, or to prosecute. Needham, 82 S.W.3d at 319. Rather, the governmental
entity must be authorized either to (1) regulate under or to enforce “the law alleged
to be violated” or (2) investigate or to prosecute “a violation of criminal law.” Id. at 
320. Thus, we must determine whether BARC had the authority to regulate under,
to enforce, to investigate, or to prosecute the reported violations of the City Code, the
Texas Penal Code, and the Health and Safety Code. Id. at 320. 
          In support of its arguments, the City again asserts that Levingston was merely
“complaining to a supervisor that employees were not performing their duties, a
complaint targeted to initiate corrective action or discipline.” It also asserts that
Levingston “knew that BARC did not prosecute complaints of animal cruelty,” and
it refers us to the testimony of Earl Travis, the Deputy Director of the City’s
Department of Health and Human Services and former Division Manager of BARC,
who stated generally that BARC could not “enforce” section 42.09 of the Texas Penal
Code. The City asserts that
BARC is not, nor could it ever be considered, a law enforcement
authority. It is disingenuous for Levingston to even suggest that it was.
          This representation, made in the City’s brief and repeated at oral argument, is
in direct contradiction to the testimony of Travis that “BARC has law enforcement
responsibilities in animal related issues within the City of Houston.” Travis testified
that BARC, under Chapter 6 of the City Code, “was charged, as an organization, with
enforcing animal ordinances.” 
          As noted above, many of Levingston’s specific reports to Nix against BARC
employees, including those involving the deprivation of food and water, the rationing
of food, and the placement of animals in unsafe conditions in which they were injured
or killed, concerned violations of the City Code. See Houston, Tex., Ordinances
ch. 6, art. I, § 6-6(1), (2), (9). Moreover, Section 6-19 of the City Code, titled
“Powers of enforcement officers,” states that “[t]he health officer, the animal control
officers and other authorized employees of the [D]epartment [of Health and Human
Services] shall have all of the powers and authority of police officers to the extent
only and no further of enforcing this chapter and other ordinances of the city relating
to animals and fowl.” Id. § 6-19 (emphasis added). Section 6-20 of the City Code,
titled “Notice of violations,” provides:
All duly appointed and qualified peace officers, the animal control
officers of the [D]epartment [of Health and Human Services] . . . are
authorized to issue written citations to persons violating this chapter or
any other ordinance governing the regulation of animals.
 
Id. § 6-20 (emphasis added). Accordingly, we hold that BARC was an appropriate
law enforcement authority under the Act to which to report a violation of sections  
6-6(1), (2), and (9) of the City Code.
          In regard to Levingston’s assertions that many of his complaints against BARC
employees concerned violations of the Texas Penal Code, the City states that “BARC
had no authority to and never enforced the Penal Code regarding animal abuse or
cruelty.” It also asserts that “[n]o BARC Division Manager had ever and, further,
was not authorized to regulate, enforce, investigate or prosecute violations of animal
cruelty laws.” We note, however, that section 6-20 of the City Code actually
contemplates the employment of “peace officers” by the Health and Human Services
Department, and it authorizes such “peace officers” and animal control officers to
issue citations for violations of Chapter 6. Id. § 6-20. All peace officers have the
duty “to preserve the peace within the officer’s jurisdiction” by “all lawful means.” 
Tex. Code Crim. Proc. Ann. art. 2.13(a) (Vernon 2005). All peace officers are also
statutorily required, “in every case” authorized by the provisions of the Texas Penal
Code, to “interfere without warrant to prevent or suppress crime” and “arrest
offenders without warrant in every case where the officer is authorized by law.” Id.
art. 2.13(b)(1), (4). Peace officers must also “give notice to some magistrate of all
offenses . . . where the officer has good reason to believe” there has been a violation
of the Texas Penal Code.” Id. art. 2.13(b)(3). Thus, any peace officers actually
employed by BARC would be statutorily required to enforce section 42.09 of the
Texas Penal Code.
          Additionally, the very same 1975 court order upon which Nix relied in making
his recommendation to Kendrick that Levingston be indefinitely suspended from
BARC expressly states:
[t]hat all persons in supervisory positions at [BARC] file charges under
the appropriate provisions of the Criminal Statutes of the State of Texas
against any and all persons under their supervision who are known by
said supervisory persons, now or in the future, to have violated such
provisions of the Criminal Statutes of the State of Texas while on the
premises of [BARC] or while purportedly performing their duties as
employees of [BARC] no matter where such actions take place, and that
such supervisory persons shall give such testimony as they may be
required or able to give in all cases where such charges are filed and that
such supervisory persons shall do all things reasonably within their
power to see that such charges are prosecuted.

(Emphasis added.) This order was agreed to and signed by the City’s then “Senior
Assistant City Attorney.” Not only did Nix, as Division Manager of BARC, have the
power to investigate such violations of the Texas Penal Code by those under his
supervision, but he also had the legal duty to do so and to “file charges” and to
provide evidence against those persons. In fact, in his June 1, 1999 memorandum to
Levingston, Nix represented to Levingston that he was “greatly disturbed” by
Levingston’s allegations and that he had “initiated an investigation” of the allegations 
“to initiate appropriate action against parties who participate in such mistreatment.”
          Accordingly, we hold that BARC was an appropriate law enforcement
authority under the Act to report violations of section 42.09 of the Texas Penal Code
committed by BARC employees. Given Nix’s supervisory position over all of
BARC, he was certainly in the best position to receive such reports on behalf of
BARC.
          Finally, as noted above, section 821.002(a) of the Health and Safety Code
specifically applies to employees of governmental entities like BARC. It requires that
all BARC employees “supply . . . animal[s] with sufficient wholesome food and water
during [their] confinement.” Tex. Health & Safety Code Ann. § 821.002(a). Nix,
as BARC’s Division Manager, was obviously in the best position to make sure that
the employees working under him were in compliance with this statute. Also, as
noted above, BARC’s animal control officers, under their regulatory and enforcement
function pursuant to section 821.022, have the ability to obtain a warrant to seize any
“cruelly treated” animals. Accordingly, we hold that BARC was an appropriate law
enforcement authority under the Act to report violations of sections 821.002 and
821.022 of the Health and Safety Code.
          Relying on Kallina and City of Weatherford v. Catron, 83 S.W.3d 261 (Tex.
App.—Fort Worth 2002, no pet.), the City asserts that Levingston, in making his
complaints to Nix, was merely doing his job, i.e., reporting that BARC “employees
were not preforming their duties, a complaint targeted to initiate corrective action or
discipline.” It also notes that the statutory definition of “an appropriate law
enforcement authority” does not include “an employer’s general power to investigate
or power to internally discipline its own employees for an alleged violation.”
          In Catron, the court held, as a matter of law, that the City of Weatherford was
not an appropriate law enforcement authority under section 554.002(b) of the Act for
the reporting of another employee’s violation of federal or state sexual harassment
laws. 83 S.W.3d at 268–69. It noted that the municipality’s general authority to
regulate under, to enforce, and to investigate claims of sexual harassment was not
enough to make it an appropriate law enforcement authority under the Act. Id. at 268. 
The court also noted that the plaintiff employee’s reports of harassment to the
personnel director and the utilities director “all point[ed] to the municipality’s internal
discipline.” Id. at 269. Thus, the court further held that there was no evidence that
the employee had a good-faith belief that the municipality was an appropriate law
enforcement agency for reports of sexual harassment. Id.
          In the portion of Kallina cited by the City as authority that BARC is not an
appropriate law enforcement authority for reports of animal abuse, the court
addressed the issue of whether the plaintiff employee’s supervisor was a
representative of an appropriate law enforcement authority for a theft report. 97
S.W.3d at 172–73. The court noted that the supervisor had the “authority to
investigate employees’ conduct and carry out internal disciplinary procedures, but no
authority to enforce the theft laws of the state of Texas.” Id. at 174. Because the
plaintiff employee “knew” that the supervisor “could only forward evidence of theft
to the police for actual investigation and prosecution,” the court held that the
supervisor’s department “was not an appropriate law enforcement authority under the
Whistleblower Act, and there was no evidence that [the employee] had an objectively
reasonable belief otherwise.” Id.
          Both Catron and Kallina are substantively distinguishable from the instant
case. In neither case did the governmental entity have the authority either to (1) 
regulate under or to enforce “the law alleged to be violated” or (2) investigate or to
prosecute a “violation of criminal law.” See Needham, 82 S.W.3d at 319–20. 
          Here, in contrast, BARC had the authority to regulate under or to enforce
sections 821.002 and 821.022 of the Health and Safety Code. More importantly, it
had the authority to investigate violations of criminal law, i.e., violations of sections
6-6(1), (2), and (9) of Chapter 6 of the City Code and section 42.09 of the Texas
Penal Code committed by BARC employees. All “peace officers and animal control
officers” employed by BARC could in fact issue citations for violations of Chapter
6, and all BARC supervisors, including Nix, were subject to an agreed-to court order
to investigate, to file charges against, and to present evidence against any BARC
employee who violated section 42.09 of the Texas Penal Code. Although Levingston
testified that he made his reports to Nix to correct the persistent problems at BARC,
he also testified that he made his reports to Nix at BARC and “not someone else”
because
[i]t’s against the law to treat the animals inhumanely. This is the
authority for which the inhumane treatment should be reported to. And
it’s the law. 
He elaborated:
BARC is an agency that has the ability to make investigations. They are
the law. They have to enforce the law, and that’s why I felt that BARC
was the agency that I should go to. 

He further testified that he, himself, “did go out a few times to investigate animal
abuse with a team from BARC.”
          We conclude that Levingston satisfied both the objective and subjective
elements of the Needham test. See 82 S.W.3d at 321. We hold that the evidence is
legally sufficient to support the jury’s implied findings that Levingston, in good faith,
believed that BARC was an appropriate law enforcement authority to which to report 
the above pertinent violations of the City Code, the Texas Penal Code, and the Health
and Safety Code and that his belief was reasonable in light of his training and
experience.
          Accordingly, we further hold that the trial court did not err in denying the
City’s motion for judgment notwithstanding the verdict on the grounds that
Levingston failed to prove that “a reasonably prudent veterinarian would have a
good-faith belief” that he had reported a violation of law to an appropriate law
enforcement authority. 
          We overrule the City’s first issue.
Causation
          In its second issue, the City argues that the trial court erred in denying its
motion for judgment notwithstanding the verdict because Levingston produced no
evidence that his reports to Nix caused the termination of his employment. The City
contends that Levingston wrote his May 20, 1999 letter to Nix complaining of the
inhumane treatment of animals “to forestall the inevitable consequences of his
malpractice in allowing the mother Rottweiler to bleed to death.” In support of this
contention, the City asserts that Levingston’s complaints began only after Simmons’s
investigation of the death of the Rottweiler had begun. 
          Initially, we note that Levingston contends that because Nix’s recommendation
to terminate Levingston’s employment occurred within 90 days of his May 20, 1999
letter, “it is presumed that a causal nexus existed between his reports and the
termination recommendation.” The Act allows for a presumption, “subject to
rebuttal,” of the causal connection if the employee is terminated or suspended not
later than 90 days after the reported violation of law. Tex. Gov’t Code Ann. §
554.004(a) (Vernon 2004). However, the presumption does not shift the burden of
proof and stands only in the absence of contrary evidence. Tex. Natural Res.
Conservation Comm’n v. McDill, 914 S.W.2d 718, 723 (Tex. App.—Austin 1996, no
writ). Once sufficient evidence is produced to support a finding of the non-existence
of the causal connection between the termination or suspension and the reported
violation of law, the case proceeds as if no presumption had ever existed. Id. at 724. 
Here, the City presented evidence that Nix recommended the termination of
Levingston’s employment based not on his reports of illegal activity at BARC, but
on his negligent treatment of the Rottweiler and the Great Dane. Accordingly, we
hold that Levingston was not entitled to the presumption of section 554.004(a). 
          To prove causation in a Whistleblower case, a public employee must
demonstrate that after he reported a violation of law, in good faith, to an appropriate
law enforcement authority the employee suffered discriminatory conduct by his
employer that would not have occurred when it did had the report not been made. 
City of Fort Worth v. Zimlich, 29 S.W.3d 62, 67 (Tex. 2000) (citing Tex. Dep’t of
Human Servs. v. Hinds, 904 S.W.2d 629, 633 (Tex. 1995)). In other words, the
employee must establish a “but for” causal nexus between his report of the illegal
activity and the employer’s prohibited conduct. McDill, 914 S.W.2d at 723. 
However, the employee need not prove that his reporting of the illegal activity was
the sole reason for the employer’s adverse action. Hinds, 904 S.W.2d at 634.
          Circumstantial evidence may be sufficient to establish such a causal link
between the adverse employment action and the reporting of the illegal conduct.
Zimlich, 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of
illegal conduct; (2) expression of a negative attitude toward the employee’s report of
the conduct; (3) failure to adhere to established policies regarding employment
decisions; (4) discriminatory treatment in comparison to similarly situated employees;
and (5) evidence that the stated reason for the adverse employment action was false. 
Id. However, evidence that an adverse employment action was preceded by a
superior’s negative attitude toward an employee’s report of illegal conduct is not
enough, standing alone, to show a causal connection between the two events. Id. 
          In support of its argument that Levingston “failed to prove that the City’s
conduct would not have occurred when it did because of the reports,” the City asserts
that there was “a complete absence of evidence” that Dr. Kendrick had any
knowledge of Levingston’s reports of a violation of law. It claims that Kendrick
testified that Levingston, in the Loudermill hearing, did not mention anything about
the torture, inhumane treatment, or transportation of animals in a cruel manner. 
Second, the City contends that there is no evidence that “any employee expressed a
negative attitude towards [Levingston’s] reports.” It claims, to the contrary, that
“instead of responding negatively to the initial reports,” Nix “requested additional
information . . . in order to conduct an investigation into Levingston’s written
allegations.” Moreover, the City contends that there is no evidence that the City
failed to adhere to established policies regarding the decision to terminate
Levingston’s employment, that Levingston received discriminatory treatment in
comparison to similarly situated employees, or that its stated reason for terminating
Levingston’s employment was false. In regard to these last three points, the City
notes that Dr. Hanna’s employment as a senior veterinarian was also terminated.
          However, the evidence, when viewed in a light favorable to Levingston, is
ample to show causation under the Act. In regard to Kendrick’s knowledge of
Levingston’s reports, the record reveals that Kendrick was asked if she was “aware
at the Loudermill [hearing] . . . that Levingston had at least verbally talked to John
Nix about improprieties at BARC before the Rottweiler incident occurred?” Her
answer was, “I don’t know, sir. He may have brought it up at the Loudermill, but I
can’t recall it.” Under further questioning, Kendrick conceded that after having heard
Levingston’s complaints about BARC, she in fact asked “staff to look into some of
the issues” and told Levingston that she would give him “some feedback” in “the next
few days.” She stated that she was “concerned” about “certain quality assurance
types of things” that were discussed after the Loudermill hearing. However, she
never gave Levingston any feedback, and she could not recall if anyone had ever
come back to her with a report, an assessment, or an investigation. From this
evidence, the jury could have reasonably inferred that Kendrick, at least at the time
of the Loudermill hearing and before her recommendation to the Mayor to terminate
Levingston’s employment, was in fact aware of Levingston’s reports of animal abuse
at BARC. Regardless, Levingston testified that he, on a number of occasions, made
Nix directly aware of his reports of animal abuse at BARC, and Kendrick testified
that it was “most likely” that Levingston’s employment would not have been
terminated but for Nix’s recommendation of indefinite suspension. 
            Also, the record does not support the City’s representation that no employee
expressed a negative attitude toward Levingston’s reports and that Nix truly wanted
additional information to conduct an investigation into his allegations. The record
does reveal, however, that although Nix, in his June 1, 1999 memorandum to
Levingston, represented that he had “initiated an investigation” of Levingston’s
allegations, Nix, in fact, on June 10, 1999, wrote a memorandum to the Assistant
Director of the Health and Human Services Department recommending that
Levingston be indefinitely suspended from BARC. Also, although Nix testified that
he instructed animal control officer Simmons to investigate Levingston’s animal
abuse allegations, Simmons testified that Nix did not ask him to investigate the
allegations. Moreover, Levingston testified that he wrote his May 20, 1999 letter to
Nix to formalize his concerns because Nix was ignoring his complaints and that
Hanna told Levingston that Nix was irritated with Levingston “because [he] was
giving him so many cards and talking so much about the inhumane treatment of
animals.” The simple fact remains that within 17 days of having received
Levingston’s letter on May 24, 1999, Nix recommended that Levingston’s
employment be terminated.
          It is true, as noted by the City, that Hanna’s employment as a senior
veterinarian was also terminated purportedly for the same reasons as Levingston’s. 
However, Levingston did produce some evidence that the City failed to adhere to
established policies regarding the decision to terminate Levingston’s employment and
that he received discriminatory treatment in comparison to other employees who
actually had abused animals. For example, Simmons testified that, in his 18 years of
experience at BARC, he had never been asked to investigate animal abuse or neglect
by BARC clinical staff or kennel attendants until Nix asked him to investigate the
death of the female Rottweiler. He also testified that although he had found some
evidence of animal abuse by three animal control officers in the past, none of the
animal control officers had been indefinitely suspended. 
          Also, in his March 23, 2000 letter informing Levingston of his indefinite
suspension, Mayor Brown, in addition to referencing Levingston’s treatment of the
Rottweiler and Great Dane, also noted that Levingston had been disciplined in 1994
and 1995 for “excessive absenteeism” and “negligence in routine assigned duties.” 
Nix also referenced these matters in his June 10, 1999 letter recommending
Levingston’s indefinite suspension from BARC. The record reveals, however, that
Kendrick testified that such previous disciplinary action could not, under established
City policy, “be used as a basis for justification for future discipline unless done so
in a timely fashion for a similar reason, or a similar or related violation.” In fact, after
Levingston had been disciplined for these matters, he received perfect-attendance
awards from Kendrick and strong performance evaluations from Hanna while Nix
was BARC’s division manager. Yet, despite the City’s policy, the Mayor, in his
letter, noted that Kendrick “was left with no other alternative” but to recommend
Levingston’s indefinite suspension “[s]ince previous disciplinary actions have failed
to correct his unacceptable behavior.” 
          Finally, Levingston presented ample evidence from which the jury could have
reasonably inferred that the City’s stated reason for terminating Levingston’s
employment was a pretext. In addition to all of the above evidence, the record reveals
that Kendrick decided to proceed with Loudermill hearings against Levingston and
Hanna based on their alleged negligence as veterinarians, even though neither Nix nor
Simmons nor she were veterinarians. Only after Kendrick had conducted Hanna’s
Loudermill hearing did the City hire a veterinarian to review the actions of
Levingston and Hanna in regard to the Rottweiler and Great Dane. 
          The City hired Dr. DeWees, an individual with 18 months experience as a
veterinarian. DeWees had never visited BARC and had no experience with working
at a public pound or in a kennel. He also did not know the patient load at BARC or
how many veterinarians worked there. His opinions that Levingston and Hanna were
negligent in the treatment of the Rottweiler and Great Dane were based on “some
reports that were essentially information that was handwritten information from the
kennel attendants about who they notified about problems with certain animals.” The
City basically instructed DeWees to “just come down to the City library,” where it
had some documents for him to review to write his report. He did not visit with
Hanna, Levingston, the veterinary technicians, or any of the kennel attendants before
forming his opinions. Moreover, DeWees was not even aware of what equipment,
instruments, and laboratory testing were available to the veterinarians at BARC. 
Although he was critical of Levingston for not having ordered a parvo test on the
Rottweiler, DeWees did not even know that such a test was not available to BARC
veterinarians. He also, in regard to the Great Dane, did not know that x-rays were not
available to BARC veterinarians. Under cross-examination, DeWees admitted that
it could not have been negligence or malpractice for Levingston not to order the
parvo test or x-rays. DeWees was also unaware of Levingston’s assertion that he had
in fact physically examined the Great Dane, and, had DeWees known this, he
“wouldn’t have found fault with not examining the animal.” Moreover, concerning
the euthanization of the Rottweiler, DeWees also admitted that he did not agree with
BARC’s written policy that “some degree of pain and suffering must be tolerated as
necessary” to reunite a pet with its family.  
          The record reveals that even though DeWees based his criticisms of
Levingston’s treatment of the Rottweiler and the Great Dane in large part on
Levingston’s not ordering certain tests on the animals, Kendrick knew that those
particular tests were not available at BARC. Even still, Kendrick recommended to 
Mayor Brown that Levingston’s employment be terminated, and the Mayor, in his
March 23, 1999 letter informing Levingston of his indefinite suspension from BARC,
relied heavily on DeWees’s report. Moreover, after Kendrick reported Levingston’s
treatment of both the Rottweiler and the Great Dane to the Texas State Board of
Veterinary Examiners, the Board closed the case with “no violations found.” From
this evidence, the jury could have reasonably concluded that the City’s stated reason
for terminating Levingston’s employment was in fact false.
          The bottom line is that although the City presented evidence that Levingston
was fired because of his treatment of the two dogs, Levingston presented substantial
evidence to the contrary and, through cross-examination, brought the credibility of
the City’s witnesses into question. The jury, as the fact finder, had the opportunity
to view the witnesses and was the sole judge of their credibility and the weight to give
to their testimony. Eberle v. Adams, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st
Dist.] 2001, pet. denied). Levingston presented evidence disputing the reason
proffered by the City for the termination of his employment, and the jury was free to
disbelieve the City’s proffered reason. We hold that the evidence is legally sufficient
to support the jury’s findings that Levingston’s reports of animal abuse to BARC was
“a cause” of the City’s terminating his employment when it did. See City of Fort
Worth v. Johnson, 105 S.W.3d 154, 168 (Tex. App.—Waco 2003, no pet.) (finding
legally sufficient circumstantial evidence to show causation when only one similarly
situated employee was treated differently from plaintiff); see also Tomhave v. Oaks
Psychiatric Hosp., 82 S.W.3d 381, 386 (Tex. App.—Austin 2002, pet. denied)
(explaining that timing in retaliatory discharge is important and that retaliatory
discharge may be based on immediacy of termination following report), overruled on
other grounds by Binur v. Jacobo, 135 S.W.3d 646 (Tex. 2004). Accordingly, we
further hold that the trial court did not err in denying the City’s motion for judgment
notwithstanding the verdict on this ground. 
          We overrule the City’s second issue.
Mental-Anguish Damages
          In its third issue, the City argues that the evidence is legally insufficient to
support any award of past or future mental-anguish damages to Dr. Levingston. In
regard to Levingston’s damages, the jury answered question number two of the
charge, in pertinent part, as follows:
What sum of money if paid now in cash would fairly and reasonably
compensate Sam Levingston for his damages, if any, that resulted from
[the City’s] conduct?

          . . . .
 
          c.)      Compensatory damages suffered in the past.

          Answer: $500,000.00
 
d.)Compensatory damages that [Levingston] will, in all reasonable
probability, suffer in the future.

          Answer: $375,000.00

          In the instructions accompanying this question, the charge defined the term
“compensatory damages” as including “pecuniary losses, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary
damages.” As noted above, in its final judgment, the trial court reduced the amount
of past and future compensatory damages awarded to Levingston from $875,000 to
$250,000, in accordance with the statutory cap requirements of the Act. See Tex.
Gov’t Code Ann. § 554.003(c)(4) (Vernon 2004). 
          At the charge conference, the City did not object to the submission or to the
wording of question number two, which listed generally several separate types of
“compensatory damages” recoverable under the statute, including pecuniary losses,
emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life,
and other nonpecuniary damages. In its motion for new trial and on appeal, the City
challenges the legal sufficiency of the evidence supporting an award of mental-anguish damages to Levingston, but does not challenge the sufficiency of the
evidence supporting an award for the other types of damages included in the charge’s
definition of compensatory damages.
          The Texas Supreme Court has held that when a broad-form damages question
commingles valid and invalid elements of damages and an appellant’s objection is
timely and specific, the resulting error is harmful, and a new trial is required when an
appellate court cannot determine whether the jury based its verdict on an improperly
submitted, invalid element of damage. Harris County v. Smith, 96 S.W.3d 230, 234
(Tex. 2002). Here, however, the City did not object to the broad-form submission of
the damages issue. Accordingly, because the City did not ask for separate damage
findings, it can challenge only the legal sufficiency of the evidence supporting the
entire award of damages. See id. at 232 (citing Thomas v. Oldham, 895 S.W.2d 352,
360 (Tex. 1995)). Because the City does not make the argument that the evidence is
insufficient to support the entire damage award, we must reject its evidentiary
challenge. Id. (citing Thomas, 895 S.W.2d at 360). When damages issues are
submitted in broad-form, it is difficult, if not impossible, to determine the amount that
the jury awarded for each element of damages. As a result, to challenge a multi-element damage award on appeal successfully, a party must address all of the
elements of damages and show that the evidence is insufficient to support the entire
damage award. G.T. Mngmt., Inc. v. Gonzalez, 106 S.W.3d 880, 885 (Tex.
App.—Dallas 2003, no pet.); Norfolk S. Ry. Co. v. Bailey, 92 S.W.3d 577, 583–84
(Tex. App.—Austin 2002, no pet.). Thus, the failure to address all the elements of
the damage award results in a waiver of the sufficiency challenge. Gonzalez, 106
S.W.3d at 885; Bailey, 92 S.W.3d at 584.
          Accordingly, because the City has challenged only the legal sufficiency of the
evidence to support an award of mental-anguish damages to Levingston, and has not
addressed the sufficiency of the evidence concerning the other elements of damages
submitted to the jury in question number two, we hold that the City has waived
appellate review of its sufficiency challenge.
          We overrule the City’s third issue.
Award of Value of Reinstatement and Interest
          In its fourth issue, the City argues that the trial court erred in awarding Dr.
Levingston $235,000 as the economic value of reinstatement to his former position
because “the Texas Whistleblower Act does not grant the value of future lost wages
and reinstatement outside the statutory cap” on compensatory damages. Levingston
counters that the statute “simply and plainly” provides for his mandatory
reinstatement, and that, because the City contended that Levingston could not be
reinstated, the trial court, as an alterative to reinstatement, appropriately awarded
“front pay,” or the “value of such reinstatement.”
          Here, the jury returned a verdict awarding Levingston $116,500 in past lost
wages, $250,000 in future lost wages, $500,000 in past compensatory damages, and
$375,000 in future compensatory damages. Levingston filed a proposed judgment,
which included an award of the above amounts and an order reinstating him to his
former position or an equivalent position, with all benefits and rights, within 10 days. 
The City filed a response to the proposed judgment, contending that Levingston was
not entitled to reinstatement and stating that “it would not further the cause of justice”
to return Levingston to his former position. Levingston filed a reply, again requesting
reinstatement or, as an alternative to reinstatement, an award of “front pay” in the
amount of $250,000, based on the jury’s finding of future lost wages.


 The parties
then entered a stipulation that it was not feasible to reinstate Levingston. The trial
court entered judgment awarding Levingston, among other things, the “value of
reinstatement of [Levingston] to his former position or an equivalent position, fringe
benefits and seniority rights lost because of the termination” in the amount of
$235,000. The trial court did not include in its judgment the jury’s award of
$250,000 for future lost wages.
Reinstatement and Front Pay
          Section 554.003 of the Texas Government Code provides that a public
employee whose employment is suspended or terminated or who is subjected to an
adverse personnel action in violation of section 554.002 “is entitled to sue” for
          (1)     injunctive relief;
          (2)     actual damages;
          (3)     court costs; and 
          (4)     reasonable attorney fees. 
Tex. Gov’t Code Ann. § 554.003(a) (Vernon 2004). 
          In “addition to relief under Subsection (a),” the public employee “is entitled”
to
(1) reinstatement to the employee’s former position or an equivalent
position;
 
(2) compensation for wages lost during the period of suspension or
termination; and 
 
(3) reinstatement of fringe benefits and seniority rights lost because
of the suspension or termination. 

Id. § 554.003(b) (Vernon 2004) (emphasis added). 
          Pursuant to the plain language of section 553.004(b), the City’s duty to
reinstate Levingston’s employment was mandatory, and Dr. Levingston was entitled
to reinstatement as a matter of law based on the jury’s finding that Levingston’s
reports to BARC were a cause of the City’s termination of his employment. See City
of Univ. Park v. Van Doren, 65 S.W.3d 240, 252 (Tex. App.—Dallas 2001, pet.
denied) (stating that similarly worded workers’ compensation statute “is couched in
mandatory language and contains no exceptions”). However, because the City
objected to Levingston’s reinstatement and the parties ultimately stipulated that it was
not feasible to reinstate Levingston to his former position or an equivalent position,
we must now determine whether the trial court was authorized to award Levingston
the economic value of such reinstatement, commonly referred to by courts as “front
pay,” and whether this award was subject to the pertinent statutory cap.


 See Tex.
Gov’t Code Ann. § 554.003(c) (Vernon 2004).
          The concept of “front pay” is not novel, and Justice Clarence Thomas, writing
for a unanimous Supreme Court, has explained that 
[f]ront pay is simply money awarded for lost compensation during the
period between judgment and reinstatement or in lieu of reinstatement.
. . . In cases in which reinstatement is not viable because of continuing
hostility between the plaintiff and the employer or its workers, or
because of psychological injuries suffered by the plaintiff as a result of
the discrimination, courts have ordered front pay as a substitute for
reinstatement.
 
Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846, 121 S. Ct. 1946, 1948
(2001). The Supreme Court noted that courts have “recognized that reinstatement
[is] not always a viable option, and that an award of front pay as a substitute for
reinstatement in such cases [is] a necessary part of the ‘make whole’ relief mandated”
in employment discrimination legislation and by the Supreme Court. Id., 532 U.S.
at 850, 121 S. Ct. at 1950. Thus, front pay is “awarded to compensate the plaintiff
for future lost wages and benefits.” Giles v. Gen. Elec. Co., 245 F.3d 474, 489 n.27
(5th Cir. 2001); see also Hansard v. Pepsi-Cola Metro. Bottling Co., Inc., 865 F.2d
1461, 1469 (5th Cir. 1989) (stating that “‘[f]ront pay’ refers to future lost earnings”). 
And, as noted by the Fifth Circuit Court of Appeals, while reinstatement is generally
preferable to an award of front pay, a court may award front pay in lieu of
reinstatement. Giles, 245 F.3d at 489 n.27 (finding evidence sufficient to support
lump-sum award of front pay under Americans with Disabilities Act); cf. Hansard,
865 F.2d at 1470 (finding award of front pay improper without preceding finding that
reinstatement was not feasible). 
          Texas courts have also recognized the availability of an equitable award for
front pay when reinstatement is not a feasible option. United Servs. Auto. Ass’n v.
Brite, 161 S.W.3d 566, 573 (Tex. App.—San Antonio 2005, pet. granted) (affirming
award of front pay under Texas Commission on Human Rights Act); Wal-Mart
Stores, Inc. v. Davis, 979 S.W.2d 30, 45 (Tex. App.—Austin 1998, pet. denied)
(same).
          In Pollard, an employee brought a sexual-harassment claim against her
employer under Title VII of the Civil Rights Act of 1964.


 532 U.S. at 845, 121 S.
Ct. at 1948. The district court denied the employee’s request for “front pay.” Id., 532
U.S. at 846–47, 121 S. Ct. at 1948. In determining whether the employee was entitled
to an award of “front pay,” the Supreme Court addressed section 706(g) of the Civil
Rights Act, which authorized courts to “enjoin the respondent from engaging in such
unlawful employment practice, and order such affirmative action as may be
appropriate, which may include, but is not limited to, reinstatement or hiring of
employees, with or without back pay . . . or any other equitable relief as the court
deems appropriate.”


 Id., 532 U.S. at 847–48, 121 S. Ct. at 1949. The Supreme
Court confirmed the availability of front pay as an equitable remedy under the Civil
Rights Act. Id., 532 U.S. at 853–54, 121 S. Ct. at 1952.
          In affirming the availability of front pay awards in lieu of reinstatement, the
Supreme Court explained:
We see no logical difference between front pay awards made when there
eventually is reinstatement and those made when there is not. 
Moreover, to distinguish between the two cases would lead to the
strange result that employees could receive front pay when reinstatement
eventually is available but not when reinstatement is not an
option—whether because of continuing hostility between the plaintiff
and the employer or its workers, or because of the psychological injuries
that the discrimination has caused the plaintiff. Thus, the most
egregious offenders could be subject to the least sanctions. 
 
Id., 532 U.S. at 853, 121 S. Ct. at 1952.
          Neither section 706(g) of the Civil Rights Act, addressed by the Supreme Court
in Pollard, nor section 554.003 of the Texas Whistleblower Act, at issue in this case,
expressly authorizes front pay. However, as noted above, section 706(g) authorizes
a court to order, in addition to other remedies, “reinstatement or hiring of employees,
with or without back pay, . . . or any other equitable relief as the court deems
appropriate.” 42 U.S.C.S. § 2000e-5(g)(1) (2005). Likewise, section 554.003(b)
expressly states that, “in addition” to other statutorily authorized relief, including
actual damages, an employee is entitled to reinstatement, compensation for wages lost
during the period of suspension or termination, and reinstatement of fringe benefits
and seniority rights. Tex. Gov’t Code Ann. § 554.003(b). 
          Under the plain language of the section 554.003(b), Levingston was entitled
to receive, in addition to actual damages, compensation for lost wages during the
period of his indefinite suspension, including not only the period from the date of his
suspension until the date of judgment, but also for any period of suspension that
extended beyond the date of judgment. For example, if the parties had agreed that
Levingston could not be reinstated until six months after the date of the judgment,
Levingston would have been entitled to compensation, or “front pay,” from the date
of suspension until the future date of his reinstatement. Here, however, the City
objected to Levingston’s request for reinstatement, alleging that reinstatement was
not an option. Levingston then entered into a stipulation that reinstatement was not
feasible. Levingston should not be deprived of compensation for the period of his
suspension simply because the City was either unwilling or unable to take him back. 
Thus, the period of suspension or termination for which Levingston would be entitled
to compensation would necessarily include the time from the date of suspension until
the date of judgment, and also some time period in the future. In light of the
infeasibility of reinstating Levingston to his former position, we hold that the trial
court did not err in awarding Levingston “front pay,” or the economic value of his
reinstatement, in lieu of reinstatement under section 554.003(b). 
          Accordingly, we must now determine whether such an award is subject to the
statutory cap on compensatory damages in section 553.004(c). Again, we turn to the
Supreme Court’s opinion in Pollard for guidance. The court in Pollard noted that,
in 1991, without amending section 706(g) of the Civil Rights Act, Congress expanded
the remedies available in intentional employment discrimination cases by including
compensatory and punitive damages, but limited the recovery of such damages by
enacting various statutory damage caps.


 532 U.S. at 851, 121 S. Ct. at 1951. The
cap in the Civil Rights Act states:
          The sum of the amount of compensatory damages awarded under
this section for future pecuniary losses, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and other
nonpecuniary losses, and the amount of punitive damages awarded
under this section, shall not exceed, for each complaining party . . . .
 
42 U.S.C.S. § 1981a(b)(3) (2000) (emphasis added). 
          The wording of the statutory cap on compensatory damages in section
554.003(c) of the Texas Whistleblower Act is substantially similar to that of the cap
in the Civil Rights Act. The cap provision in the Texas Whistleblower Act states:
          [A] public employee may not recover compensatory damages for
future pecuniary losses, emotional pain, suffering, inconvenience,
mental anguish, loss of enjoyment of life, and other nonpecuniary losses
in an amount that exceeds . . . . 
 
Tex. Gov’t Code Ann. § 554.003(c) (emphasis added). 
          In considering whether an award for front pay fell within the statutory cap in
the Civil Rights Act, the Supreme Court stated that, “[i]n the abstract, front pay could
be considered compensation for ‘future pecuniary losses,’” subject to the statutory
cap on compensatory damages. Pollard, 532 U.S. at 852, 121 S. Ct. at 1951. 
However, the Court concluded that, in reading section 1981a as a whole, “the better
interpretation is that front pay is not within the meaning of compensatory damages”
and is excluded from the statutory cap. Id., 532 U.S. at 852, 121 S. Ct. at 1951. 
Thus, the Supreme Court held that awards for front pay in lieu of reinstatement did
not fall within the statutory cap on compensatory damages set forth in section 1981a. 
Id., 532 U.S. at 852–53, 121 S. Ct. at 1951–52.        
          In this case, Levingston was entitled to reinstatement, as well as compensation
for wages lost during the period of his suspension. Tex. Gov’t Code Ann. §
554.003(b). Because, as stipulated by the parties, reinstatement was not feasible,
Levingston was entitled to receive front pay for the period of his suspension in lieu
of his reinstatement. See Pollard, 532 U.S. at 852, 121 S. Ct. at 1951; see also Brite,
161 S.W.3d at 573; Davis, 979 S.W.2d at 45. In accord with the Supreme Court’s
decision in Pollard, we hold that an award for front pay in lieu of reinstatement is not
subject to the statutory cap on compensatory damages in section 554.003(c) of the
Texas Whistleblower Act. See Giles, 245 F.3d at 490 n.28 (stating that majority of
courts have concluded that front pay, as alternative to reinstatement, is “equitable in
nature and therefore falls outside the statutory limitation of ‘compensatory
damages’”).
Interest
          As part of its fourth issue, the City also argues that the trial court further erred
in awarding Levingston prejudgment interest on the award of past lost wages and
compensatory damages, which totaled $365,500, because “the Act does not authorize
prejudgment interest on compensatory damages over and above the [$250,000]
statutory cap” and because “prejudgment interest falls within the elements of a
plaintiff’s damages subject to the statutory cap.” Here, the trial court awarded
Levingston lost wages from termination through trial (i.e. past lost wages) in the
amount of $116,500, “[c]ompensatory damages capped at the amount of $250,000,”
and “prejudgment interest on the amount of $365,500.” (emphasis added).



          An employee who successfully sues under section 554.003 is entitled to
recover prejudgment interest on awards of lost wages and actual damages. See
Catron, 83 S.W.3d at 273–74; Robertson County v. Wymola, 17 S.W.3d 334, 343–44
(Tex. App.—Austin 2000, pet. denied)). The applicable statutory cap prohibits an
employee from recovering “compensatory damages for future pecuniary losses,
emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life,
and other nonpecuniary losses” in excess of certain amounts. Tex. Gov’t Code Ann.
 § 554.003(c) (emphasis added). By its plain terms, the statutory cap does not apply
to amounts awarded for past lost wages and compensatory damages for past pecuniary
losses and, thus, we will not apply the statutory cap to prejudgment interest accrued
on these amounts.


 Thus, we hold that Levingston was entitled to an award of
prejudgment interest on the trial court’s award of $116,500 for past lost wages.
          The award of prejudgment interest on the underlying award of $250,000 for
“compensatory damages” presents a more difficult issue because it is based on a jury
award of $500,000 for “compensatory damages [] in the past” and $375,000 for
“compensatory damages . . . in the future.” Because the charge defined
“compensatory damages” to include “pecuniary losses,” the jury’s award of $500,000
for past compensatory damages could have included an amount for past pecuniary
losses, which would not be subject to the cap; therefore, any prejudgment interest
earned on past pecuniary losses would also not be subject to the cap. However, we
note that the trial court separately awarded Levingston past lost wages, which likely
accounted for the pecuniary losses Levingston sustained in the past. 
          Additionally, the trial court, in its judgment, combined the jury’s compensatory
damages awards for a total award of “compensatory damages capped at the amount
of $250,000.” To the extent that the jury, in its award of past compensatory damages,
included an amount for past pecuniary losses (above and beyond its separate award
for Levingston’s past lost wages), Levingston would have been entitled to this award
in addition to his capped damages. Yet, the trial court did not make any such award
and instead only awarded “capped compensatory damages.” Consequently, any
prejudgment interest earned on these capped amounts was necessarily subject to the
cap. See Columbia Hosp. Corp. of Houston v. Moore, 92 S.W.3d 470, 474 (Tex.
2002) (holding prejudgment interest on damages subject to cap in former Medical
Liability and Insurance Improvement Act may be awarded only up to cap amount). 
Finally, we note that a plaintiff seeking prejudgment interest bears the burden of
segregating the damages on which he is entitled to such interest. See Domingues v.
City of San Antonio, 985 S.W.2d 505, 511 (Tex. App.—San Antonio 1998, pet.
denied). Here, the charge permitted the jury to award, in its figure for past
compensatory damages, both capped and uncapped damages, and the trial court’s
judgment contained a single award of $250,000 for capped compensatory damages. 
Thus, we hold that Levingston was not entitled to prejudgment interest on the award
of $250,000 in capped compensatory damages. 
          We sustain the City’s fourth issue in part and overrule the City’s fourth issue
in part. We modify the trial court’s judgment to provide for the award of prejudgment
interest on the amount of $116,500 rather than on the amount of $365,500. 
Attorneys’ Fees
          In its fifth issue, the City argues that the trial court erred in applying a
“multiplier” in calculating the award of Levingston’s attorneys’ fees. We review a
trial court’s award of attorneys’ fees for an abuse of discretion. Twin City Fire Ins.
Co. v. Jones, 834 S.W.2d 114, 116 (Tex. App.—Houston [1st Dist.] 1992, writ
denied). A trial court abuses its discretion only when it acts in an unreasonable and
arbitrary manner or when it acts without reference to any guiding rules or principles. 
Standard Constructors, Inc. v. Chevron Chem. Co., 101 S.W.3d 619, 626 (Tex.
App.—Houston [1st Dist.] 2003, pet. denied).
          Here, following the trial, Levingston’s attorneys submitted affidavits and
documentary evidence to the trial court, indicating that they had represented
Levingston on a contingent-fee basis and had spent 757.3 hours representing him in
this matter. His counsel sought reimbursement for this time at a rate of $225 per
hour, for a total of $170,392.50. In addition, Levingston’s attorneys sought an
“enhanced” amount of attorneys’ fees, based upon the various factors set forth in
Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), in
the amount of $396,450. In its final judgment, the trial court awarded Levingston
$194,107.50 in attorneys’ fees—$23,715 more than the “lodestar”


 amount submitted
by Levingston’s counsel.
          As a prevailing plaintiff in a Whistleblower suit, Levingston was entitled to the
recovery of his reasonable attorneys’ fees. See Tex. Gov’t Code Ann. §
554.003(a)(4) (Vernon 2004); see also Catron, 83 S.W.3d at 272–73. To calculate
reasonable attorneys’ fees, an attorney should multiply the number of hours worked
by the hourly rate. Guity v. C.C.I. Enter. Co., 54 S.W.3d 526, 528 (Tex.
App.—Houston [1st Dist.] 2001, no pet). The number of hours and the hourly rate
must be reasonable. Id. at 528–29. After calculating the lodestar amount, a trial court
can adjust the lodestar amount upward to account for the well-established Johnson
factors. Id. (citing Johnson, 488 F.2d 714, 717–19). The Johnson factors include:
(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the
level of skill required; (4) the effect on other employment by the attorney; (5) the
customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed
by the client or the circumstances; (8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorney; (10) the “undesirability” of
the case; (11) the nature and length of the attorneys’ relationship with the client; and
(12) awards in similar cases. Id. at 529. If some of these factors are accounted for
in the lodestar amount, they should not be considered when making adjustments. Id.
           Rather than challenge the affidavit and documentary evidence offered by
Levingston’s attorneys in support of the reasonableness of their fees and the
enhancement of the lodestar amount, the City simply argues that any award of
attorneys’ fees greater than the lodestar amount of $170,392.50 is “clearly uncalled
for” and “neither reasonable nor necessary.” However, Levingston’s attorneys
presented evidence that the case involved substantial discovery, was tried over more
than two weeks, and involved numerous fact and expert witnesses, voluminous
documentary evidence, and complicated legal issues. The evidence in the record
supports the trial court’s award of attorneys’ fees, based on the amount of work that
Levingston’s attorneys performed on the case, their experience, and the case’s
complexity.
          Accordingly, we hold that the trial court did not abuse its discretion in
awarding Dr. Levingston $194,107.50 in attorneys’ fees. 
          We overrule the City’s fifth issue.
Jury Question on City’s Affirmative Defense
          In its sixth issue, the City argues that the trial court erred in refusing to submit,
in a separate question in the jury charge, the City’s statutory affirmative defense to
Dr. Levingston’s suit under the Act. We review jury-charge error under an abuse of
discretion standard. Tex. Dep’t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.
1990). In preparing the charge, trial courts have no discretion to misstate the law. 
St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002).
          An employing governmental entity may raise, as an affirmative defense to a
suit under the Act, the fact that it “would have taken the action against the employee
that forms the basis of the suit based solely on information, observation, or evidence
that is not related to the fact that the employee made a report protected under this
chapter of a violation of law.” Tex. Gov’t Code Ann. § 554.004(b) (Vernon 2004). 
         Here, the trial court did not include a separate question concerning the
affirmative defense in section 554.004(b) in the jury charge, but included a similarly
worded instruction accompanying question number one, which read, in pertinent part:
Were Sam Levingston’s reports to BARC, if any, . . . made in good faith
and a cause of the City of Houston’s terminating his employment when
it did?

          . . . .
 
[Levingston’s] reports were not a cause if the City of Houston would
have terminated him based solely on information, observation, or
evidence that is not related to the fact that he made the reports.
          The City does not dispute that the language included by the trial court in its
instructions properly tracked that of section 554.004(b). Rather, the City asserts that
the trial court erred in including the City’s affirmative defense “obliquely in the
instructions only,” rather than as a separate question. The City urges this Court to
find reversible error in the trial court’s refusal to submit the affirmative defense as a
separate question because the City “established that it terminated Levingston based
on information and observation not related to his alleged reports.”
          Our sister court recently noted that, although section 554.004(b) has been
labeled as an “affirmative defense,” proof under this section actually negates the
causation element of a plaintiff’s cause of action. Harris County v. Vernagallo, No.
14-03-00619-CV, 2005 WL 1771128, at *5 n.12 (Tex. App.—Houston [14th Dist.]
July 28, 2005, pet. filed). This is because, under the statute, proof that the employer
would have made the same decisions solely because of a reason unrelated to the
employee’s protected report negates an essential element of the plaintiff’s cause of
action, namely, that the report was a cause of the adverse employment action. Id. “If
the plaintiff was fired solely for a reason unrelated to his report of illegal activity,
then his report could not have been a cause of his termination.” Id. Conversely, “if
the report was a cause of his termination, the plaintiff could not have been fired solely
because of an unrelated reason.” Id. Had the trial court placed the affirmative
defense in a separate question, the jury could have been confused and provided
conflicting answers to both questions. Thus, we hold that the trial court did not err
in providing a jury instruction, rather than a separate question, that tracked the
language of section 554.004(b). Additionally, we have previously held that there was
legally sufficient evidence to support the jury’s finding that Levingston’s reports were
a cause of the City’s termination of his employment when it did, and, necessarily, the
jury must have determined that Levingston could not have been fired “solely because
of an unrelated reason.” Thus, even assuming that the trial court erred in submitting
the affirmative defense in section 554.004(b) as an instruction rather than as a
separate question, such error was harmless. See Tex. R. App. P. 44.1.
          We overrule the City’s sixth issue.
Motion to Strike Request for Jury Trial
          In its seventh issue, the City argues that the trial court erred in denying the
City’s motion to strike Dr. Levingston’s request for a jury trial because, although
Levingston had paid a jury fee, he failed to make a written jury demand more than 30
days before trial. See Tex. R. Civ. P. 216.
          The record indicates that, although Levingston paid a jury fee, he did not file
a written jury demand as required by Rule 216.


 See Tex. R. Civ. P. 216. However,
Levingston notes, and the City does not contest, that, at the parties’ pretrial
conference, the trial court denied the City’s motion to strike Levingston’s request for
a jury trial subject to the City’s being given adequate time to prepare for a jury trial. 
Rather than request a continuance, the City announced that it was ready for trial,
which began the following day.
          The City argues that a jury trial impeded the ordinary handling of the court’s
business and that a bench trial would have been easier and promoted judicial
economy. However, the City has not cited any evidence to show that it was injured
or otherwise prejudiced by having to try the case to a jury or that such jury trial
caused undue disruption to the trial court. See Halsell v. Dehoyos, 810 S.W.2d 371,
371 (Tex. 1991). Moreover, an untimely request for a jury trial will become timely
when the trial is reset to a date more than 30 days after the request. Id. Here, the trial
court offered the City additional time to prepare for a jury trial, which the City
refused. Accordingly, even assuming that the trial court erred in denying the City’s
motion to strike Levingston’s request for a jury trial, we hold that any such error was
harmless. See Tex. R. App. P. 44.1(a)(1).
          We overrule the City’s seventh issue.
Conclusion
          We modify the trial court’s judgment to provide for the award of prejudgment
interest on the amount of $116,500 rather than on the amount of $365,500. We affirm
the judgment of the trial court in all other respects.
 
 
                                                                        Terry Jennings
                                                                        Justice
Panel consists of Justices Taft, Jennings, and Bland.